# Exhibit "9"

Exhibit 9 to Complaint, page 1 of 6

## DECLARATION OF Mother 2

I, Mother 2 declare under criminal penalty under the law of Utah that the foregoing is true and correct:

1. I am over the age of eighteen and competent to testify to the statements herein.

2. I married Perpetrator in June, 1988.

3. At the time I married Perpetrator, I had two daughters from a previous marriage; Jane Doe 3 age 7, and Jane Doe 4 age 5. Perp. and I then had two biological sons, J and John Doe 2.

4. Shortly before my marriage to Perpetrator, I received a call from Mother 1, Perp.'s former spouse, with whom he had four biological children. Mother 1 called to warn me that Perp. was a pedophile; that Perp. and other adult members of his ward (including D1D and D2D) had molested Mother 1's four children and other children in their ward. I was angry and didn't believe Mother 1. Perp. was an active member of the LDS Church, a member in good standing. I told her that if Perp. was a pedophile, he would have been excommunicated from the Church.

5. If the Church would have excommunicated Perp. I would have been warned that what Mother 1 was telling me was true, and I never would have married him.

6. Shortly after I questioned Perp. about these horrific allegations against him. He denied it ever happened. He explained that Heavenly Father knew it never happened because he was promised by an Apostle, either "the Apostle" or Elder Maxwell (I can't remember which because both were involved as explained in the paragraphs below), that the "heavens were closed" as it related to allegations of sexual abuse of his children. He told me the Church dismissed the accusations as false and that was evidenced by the fact that no Church court was ever held and he

- 1 -

Exhibit 9 to Complaint, page 2 of 6

was currently the executive secretary in his current ward. Without a Church court being held, Perp. had not been excommunicated.

7. From about 1984 to 1990, I worked in the Church Membership Department at the Church Office Building and was very familiar with the handbooks and policies and procedures of the Church. The only conclusion I could draw when I learned about Perp.'s alleged involvement in this child sex ring was that the allegations were all lies because he was not excommunicated nor was he criminally prosecuted. I knew how the Church procedures worked with regard to allegations of this sort; hold a Church court and excommunicate the perpetrator if the accusations are determined to be credible.

8. In about 1989 I learned that Mother 1 had obtained a sealing cancelation from Perp. I was working in the membership department at the time and knew that the policy in situations like this was for the Church to contact the other party, in this case Perp., and his Bishop to obtain their position on the matter and to determine if there was "cause" for a temple sealing cancelation. Here, neither Perp. nor our Bishop were contacted prior to the cancelation. This requirement to contact the other party is only waived if that person was excommunicated.

9. Because I worked in the membership department at the time, I knew many of the secretaries to the Apostles. I began raising questions about Perp.'s temple divorce. I couldn't understand why Church policy was being ignored. I thought back to the allegations against Perp. and began raising questions as to whether he could possibly be guilty. Whenever I would speak to someone at work about this, I was assured that the allegations must be false or he would have been excommunicated for this. I was never able to receive any straight answer on why the policy wasn't being followed relating to the sealing cancelation. I continued to ask questions of my local leaders and of my colleagues in the Church Office Building. I continued to seek answers and was

Exhibit 9 to Complaint, page 3 of 6

promised on many occasions that the matter would be looked into.

10. A few months later, still in 1989, during relief society, my Bishop called me out of class and said that he had received a call from Elder Maxwell. My Bishop told me that Elder Maxwell told him that a sister in his ward (me) "was making a lot of noise" and that I was putting him, Elder Maxwell, between a rock and a hard place and that the bishop needed to stop me. Being a fairly new bishop, he told me he didn't even realize that apostles would contact a bishop directly and that this was serious.

11. I didn't stop. I called Elder Pennock's office asking seeking answers. His secretary told me that she had never seen a sealing cancelation handled in this manner. I was confused and very concerned as to why Church policy was not being followed.

12. I knew the secretaries to the First Presidency, LH and MW I spoke to them about this. They said that the Church would follow its policy and not allow a sealing cancelation without seeking input and comment from the other party unless that other party was excommunicated. They also confirmed that someone who raped and harmed children would be excommunicated. They couldn't explain why the policy was violated in Perp.'s case. I persisted in asking questions. I never received any answers.

13. In the latter part of 1990 (possibly early 1991) I received a letter from the Office of the First Presidency, with stamped signatures from all members of the First Presidency, sent to me by Secretary MW This letter stated that if I persisted in raising these questions that I was putting my membership at risk.

14. I was disappointed, frustrated and disheartened but as a devout member of the Church, I understood the intent of this letter and the consequences to me if I disobeyed. I reluctantly obeyed.

- 3 -

Exhibit 9 to Complaint, page 4 of 6

15. Years later, in 1995, I learned that Perp. had sexually harmed my daughters and sons. I immediately separated from him. I reported the crimes to the police. Before Perp. could be prosecuted for these crimes against my children, he committed suicide.

16. I have been devastated by the abuse that has been perpetrated by Perpetrator upon my children. The impacts to me and each of my children have been severe and often debilitating. It has altered all of our lives significantly.

17. As a devout member of the Church of Jesus Christ of Latter-Day Saints and an employee in the membership department, I had an unwavering belief at the time I married Perpetrator that the accusations against him were false based on the fact that there was never a church court held and he was never excommunicated. I continued to question and seek answers about these allegations in the context of the Church not following policy and procedure relating to his temple divorce. Despite persistent efforts on my part for answers, I was hushed and my membership in the Church even threatened if I continued to ask questions.

18. As a devoted member of the Church, had **Perpetrator** been excommunicated, I NEVER would have married him, nor even dated him, and my children would never have been sexually assaulted and raped by him.

Signed on the __30____ day of September, 2018, at __Salt Lake County_____
(city or county), Utah.

Mother 2

■■■■■■■■■■■■■■■
Signature

- 5 -

Exhibit 9 to Complaint, page 6 of 6