James S. Jardine (1647)
Samuel C. Straight (7638)
Robert P. Harrington (12541)
**RAY QUINNEY & NEBEKER, PC**
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone:  (801) 532-1500
jjardine@rqn.com
sstraight@rqn.com
bharrington@rqn.com

*Attorneys for Richard and Brenda Miles*

---

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JOHN DOE 1, and JOHN DOE 2,<br><br>Plaintiffs,<br><br>v.<br><br>DOE 1 MALE DEFENDANT and DOE 2 FEMALE DEFENDANT, a community,<br><br>Defendants. | **MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**<br><br>Case No. 1:18-cv-00121-JNP<br><br>The Honorable Jill N. Parrish |

Defendants Doe 1 Male Defendant Richard Miles and Doe 2 Female Defendant Brenda Miles (together, the "Miles") submit this Motion to Dismiss for Failure to State a Claim (the "Motion") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

# TABLE OF CONTENTS

RELIEF SOUGHT ........................................................................................................... 1

INTRODUCTION .......................................................................................................... 1

BACKGROUND FACTS ................................................................................................ 3

    Nationwide Panic over Satanic, Ritualistic Sex Rings ...................................... 3

    Dr. Barbara Snow and Accounts of SRA in Utah............................................. 5

    The Alleged Bountiful Satanic, Ritualistic Sex Abuse Ring ........................... 10

    Subsequent Written Accounts of Alleged Satanic Bountiful Sexual Abuse Ring........... 12

SUMMARY OF RELEVANT ALLEGATIONS IN COMPLAINT ......................... 13

MOTION TO DISMISS STANDARD............................................................................ 13

ARGUMENT .................................................................................................................. 15

    I.     PLAINTIFFS' CLAIMS ARE TIME-BARRED AND RECENT
            AMENDMENTS TO THE UTAH CODE ARE INSUFFICIENT TO
            REVIVE THOSE CLAIMS ................................................................... 15

            A.     Plaintiffs' Claims Are Barred By the Statute of Limitations In
                   Effect at the Time of the Alleged Abuse ................................. 15

            B.     Subsequent Amendments to the Statute of Limitations Cannot
                   Permissibly Revive Plaintiffs' Claims. ................................... 16

                 1.     The Utah Supreme Court Has Consistently Held that an
                         Enlargement of a Statute of Limitations Period Cannot
                         Retroactively Revive Already Barred Claims.............................. 17

                         a.     Due Process Clause of the Utah Constitution .................. 19

                         b.     Open Courts Provision of the Utah Constitution ............. 20

                 2.     Express Legislative Intent to the Contrary Is Irrelevant .............. 21

            C.     Plaintiffs' Federal Claim Is A Criminal Statute and Any Civil
                   Claim Would Be Time Barred in Any Event (18 U.S.C. § 2251) ........... 22

CONCLUSION.................................................................................................................. 22

**RELIEF SOUGHT**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Miles move to dismiss all of Plaintiffs' claims against them with prejudice for failure to state a claim upon which relief can be granted.

**INTRODUCTION**

Before addressing the motion to dismiss, Mr. and Mrs. Miles state that they unequivocally deny the false and horrific allegations against them. Plaintiffs' counsel informed the Miles' counsel before the lawsuit was filed that the Miles are the two "Doe" defendants. The allegations are patently false and deeply offensive. The Miles never abused the children identified in the complaint or anyone else. To do so would be contrary to the Miles' beliefs, principles, and character.

This case originates from long-ago debunked reports that in the mid-1980s a large group of adolescents and adults in Bountiful, Utah, operated a satanic, ritualistic sex ring in which numerous young children and infants were forced to engage in horrific sexual acts and endure physical and mental torture. Like the thousands of similar reports of satanic, ritualistic sex rings that swept across the United States in the 1980s, the claims in this case were investigated and discredited decades ago.

The cause of the satanic, ritualistic abuse panic is now well-documented and well-understood. The specific allegations of satanic, ritualistic abuse stemmed from inappropriate and suggestive questions and interrogation techniques employed by misguided therapists and others. These inappropriate therapeutic techniques created false memories of bizarre accounts of child abuse. This case is no different.

The plaintiffs in this case **first raised accusations of abuse in the 1980s** after being "treated" by a clinical therapist named Dr. Barbara Snow. Dr. Snow was at the forefront in Utah of the satanic ritual abuse scare in the 1980s. At that time, she claimed to have uncovered at least five separate satanic ritual child abuse rings across the Wasatch Front. These alleged rings were thoroughly investigated and eventually discredited by police. Both law enforcement and the courts recognized the "strikingly" similar and bizarre rituals described in each of the rings. The children in each ring described virtually identical rituals and specific types of abuse. For example, children in each alleged ring described the use of satanic rituals and paraphernalia, and many of the children reported that other children and infants were being ritually sacrificed and even eaten.

Each of the rings was investigated and no physical evidence was uncovered. Eventually, law enforcement and the courts recognized that Dr. Snow was the connection between all the so-called sex rings in Utah. To test this theory, law enforcement fed Dr. Snow false information that immediately began appearing in the children's accounts. Dr. Snow has a history of implanting false memories of abuse in her patients. In 2007, the Utah Division of Occupational and Professional Licensing charged, among other misconduct, that she had implanted false memories of sexual abuse and military testing in her patients.

The claims in this case are based on the disproven accusations that the Miles, along with many other adolescents and adults, organized and participated in satanic, ritualistic abuse in Bountiful in the 1980s. This alleged sex ring—like all the rings Dr. Snow "discovered"—was investigated and discredited by law enforcement and prosecutors **in the 1980s**. Law enforcement's investigation conclusively cleared Mr. and Mrs. Miles of any wrongdoing and

found no evidence of the existence of any sex ring in Bountiful. The chief investigator for the Salt Lake County Attorney's Office has provided a sworn declaration attesting that no evidence of a "Bountiful sex ring" was found.[1] Counsel for plaintiffs was previously provided with this declaration, information regarding Dr. Snow's inappropriate techniques, and the results of the law enforcement's prior investigation. Unfortunately, he still chose to bring this frivolous case.

These Plaintiffs were certainly victimized by the implantation of horrific false memories causing untold and prolonged suffering. And now they are being used as pawns in an attempt to extort money from the Miles.

BACKGROUND FACTS

The following facts provide background and context for the case. The Court need not rely on these background facts in resolving the Motion to Dismiss.

Nationwide Panic over Satanic, Ritualistic Sex Rings

From the 1980s into the early 1990s, panic spread throughout the United States over reports of widespread satanic ritual abuse (also known as "SRA") involving heinous child sexual abuse, sacrifice of children and infants, killing of animals, ingestion of urine and feces, and other horrific acts.[2] During this time, hundreds of individuals across the country alleged that "thousands of offenders were abusing and even murdering tens of thousands of people as part of

---

[1] A true and correct copy of this declaration is submitted herewith as Exhibit A.

[2] David Frankfurter, *The Satanic Ritual Abuse Panic as Religious-Studies Data*, International review for the History of Religions, vol. 50, No. 1, 108 (2003); Kenneth V. Lanning, *Investigator's Guide to Allegations of "Ritual" Child Abuse*, National Center for the Analysis of Violent Crime, at 1 (January 1992).

organized satanic cults."[3]   Although there was "little or no corroborative evidence" of these

activities, numerous cases were filed against alleged perpetrators of SRA.[4]  Many of those

accused of participating in SRA spent years in prison for crimes that, it was later discovered,

they did not commit.[5]

An early example of this involved the McMartin preschool in California.  In that case,

several hundred children were interviewed by the Children's Institute International, which was

an abuse therapy clinic run by Kee MacFarlane.  Later research would reveal that Dr.

MacFarlane's interview methods created false memories.  Dr. MacFarlane's methods encouraged

children to report abuse where none had occurred and conditioned children to report accounts of

abuse consistent with other children.[6]

The McMartin preschool case was one in a long line of cases that cropped up across the

country with nearly identical allegations of ritualistic abuse.[7]  Ultimately, most of these cases

"fell apart" after it was revealed that there was no physical evidence to support the claims and

the accounts of SRA resulted from coercive interviewing in which "therapists, social workers,

and police officers unintentionally forced children to fabricate tales of brutal abuse."[8]  Most of

---

[3] Kenneth V. Lanning, *Investigator's Guide to Allegations of "Ritual" Child Abuse*, National Center for the Analysis of Violent Crime, at 1 (January 1992).  A true and correct copy is submitted herewith as Exhibit B.

[4] *Id.*

[5] Sarah Pruitt, *Babysitters Accused of Satanic Crimes Exonerated After 25 Years* (June 21, 2017), available at https://www.history.com/news/babysitters-accused-of-satanic-crimes-exonerated-after-25-years.

[6] Richard Beck, *We Believe the Children:  A Moral Panic in the 1980s* 41–50 (2015).  True and correct copies of excerpts submitted herewith as Exhibit C.

[7] *Id.* at xix.

[8] *Id.*

the prosecutions that were initially successful have been overturned.[9]

By the early 1990s, evidence was mounting against the existence SRA.[10] A report in 1992 by the Department of Justice found the reports of widespread SRA were not credible.[11] And in 1994, the National Center on Child Abuse and Neglect released another report debunking claims of SRA.[12] Today, it is widely accepted that claims of SRA resulted from unsound, and even coercive, interviewing methods that created false memories of abuse.

### Dr. Barbara Snow and Accounts of SRA in Utah

In the 1980s, Dr. Snow was at the Utah forefront of the nationwide SRA hysteria. Dr. Snow claimed to have "uncovered" five separate satanic ritual abuse rings in Utah from 1985 to 1988. In 1990, she summarized her findings in a journal article entitled "Ritualistic Child Abuse in a Neighborhood Setting." These findings are based on her sessions with 39 children who, after multiple "therapy" sessions with Dr. Snow, disclosed that they were all victims of satanic ritual abuse.

The Utah SRA rings described in Dr. Snow's article are prototypical of SRA rings identified in the nationwide hysteria. Dr. Snow reported that each of the rings—including the alleged ring at issue in this case—"involved satanic religious practices."[13] Dr. Snow reported

---

[9] *Id.* at xxi–xxii.

[10] Sarah Pruitt, *Babysitters Accused of Satanic Crimes Exonerated After 25 Years* (June 21, 2017), available at https://www.history.com/news/babysitters-accused-of-satanic-crimes-exonerated-after-25-years.

[11] *Id.*

[12] *Id.*

[13] Barbara Snow & Teena Sorensen, *Ritualistic Child Abuse in a Neighborhood Setting*, 5 Journal of Interpersonal Violence, 474, 476 (Dec. 1990), a true and correct copy of which is submitted herewith as Exhibit D.

that each of the rings included bizarre ritualistic abuse.  For example, Dr. Snow reported that children in each of the rings were forced to ingest concoctions of urine and feces.[14]  Similarly, she reported that each of the rings involved "men's wearing of women's erotic underwear" or costumes including Darth Vader, vampires, leather loin cloths, witches and devils.[15]  And she reported that the abuse was frequently perpetrated by juveniles in ways "highly sadistic in nature and frequently involved object rape with tools, knives, sticks, toys, and so on."[16]

Dr. Snow also reported that four out of the five rings included accusations of "[t]he killing of children and infants" and cannibalism.[17]  Four of the five rings included the creation of videos or photographs depicting the abuse.[18]  However, as in every other allegation of SRA, no physical evidence was ever found to corroborate the existence of any of these rings.[19]

Ironically, Dr. Snow's own article contains many indicators of the true source of the SRA scare—improper therapy using suggestive and coercive questions with positive reinforcement provided after a "disclosure" of abuse.  Dr. Snow also noted how a full 82% of the children initially showed no signs of behavioral or emotional problems—at least before she began her

---

[14] *Id.* at 482.

[15] *Id.* at 483.

[16] *Id.* at 480.

[17] *Id.* at 483.

[18] *Id.* at 482.

[19] Special Agent Lanning's report notes:  "Although many of the victims of . . . child sex rings claim that pictures and videotapes of the activity were made, no such visual record has been found by law enforcement.  In recent years, American law enforcement has seized large amounts of child pornography portraying children in a wide variety of sexual activity and perversions. None of it, however, portrays the kind of bizarre and/or ritualistic activity described by [alleged SRA] victims."  Kenneth V. Lanning, *Investigator's Guide to Allegations of "Ritual" Child Abuse*, National Center for the Analysis of Violent Crime, at 16 (January 1992).

"therapy."[20]  Indeed, she writes that she was "struck by the apparent normalcy of the children included in the study . . . ."[21]  She also explained:

> As the process of disclosure [i.e. her "therapy" sessions] brought children closer to their psychological pain and terror, behavior and emotional problems emerged.  Indeed, it appeared that children got worse before they got better.  Depression with an unusual impending sense of death at their own or another's hand, extreme hyperactivity, aggressive acting out, obsessive fears and compulsions, reenactment of abuse rituals, and intense sibling conflict characterized the children's behavior as the disclosure process progressed.[22]

Similarly, Dr. Snow noted that many of the "perpetrators" appeared perfectly normal and even respectable whose "daily lives represent a conspicuous model of morality."[23]  She wrote:

> They were typically in marital relationships that nonoffending partners described as stable and low in conflict.  Many were respected parents with positive family images.  Many were recognized in their various areas of employment, including the legal and child-care professions. . . . [Female perpetrators] were most often mothers and grandmothers who were involved in church, community, and extracurricular activities of children.[24]

---

[20] Barbara Snow & Teena Sorensen, *Ritualistic Child Abuse in a Neighborhood Setting*, 5 Journal of Interpersonal Violence, 474, 477 (Dec. 1990).

[21] *Id.* at 485.

[22] *Id.* at 485.  It appears that some, if not all, of these behavioral problems were actually *encouraged* as part of the "therapy."  It is likely this was part of a memory recovery technique called "Rage Work" where a patient is encouraged to "focus the survivor's anger, resentment, and hostility where they belong: on the perpetrator.  Clinicians suggest a variety of techniques for rage work, including whacking the floor, the walls, an old sofa, or a pile of cushions with a tennis racket, rubber hose, rolled-up towel or newspaper, or an 'encounter bat' (a soft foam rubber club); stomping on old egg cartons or aluminum cans; practicing karate kicks; shredding a phone book with your bare hands; or simply screaming as loud and long as you can."  *See* Elizabeth Loftus, The Myth of Repressed Memory at 168.  In fact, Dr. Snow's business partner writes about conducting "hero parties" where the she encouraged the children to draw pictures of their alleged abusers, rip them up and burn them.  Her husband then "pounded an old slipper and said he was pretending it was" one of the alleged abusers.  April Daniels and Carol Scott, Paperdolls - Healing from Sexual Abuse in Mormon Neighborhoods 55–56 (1992).

[23] Barbara Snow & Teena Sorensen, *Ritualistic Child Abuse in a Neighborhood Setting*, 5 Journal of Interpersonal Violence, 474, 486 (Dec. 1990).

[24] *Id.* at 480–81.

Dr. Snow's description of her therapy also demonstrates the true cause of the false allegations. She admits that "[n]ot a single child subject made [a] 'purposeful' disclosure. The majority of the children initially denied any knowledge or involvement and many maintained silence for a significant length of time."[25] And most of the children who were treated were initially referred to Dr. Snow after having "been named as a victim by another child."[26] In two of the neighborhoods, several children were brought to therapy by their parents.[27] The parents initially participated in and encouraged their children about the therapy.[28] Eventually, however, those same parents were accused of incest by their children that they had encouraged to participate in therapy.[29] Dr. Snow explained that it was only "[d]uring the course of therapy" that those children "revealed the incest component."[30]

Courts have repeatedly questioned Dr. Snow's conclusions. For example, in 1990, the Utah Supreme Court reversed a conviction after a district court improperly excluded evidence about Dr. Snow's involvement in other ritualistic sexual abuse ring cases. Justice Durham noted that at trial Dr. Snow's methods "were strongly and effectively criticized" because the memories of the alleged victim children "had been irretrievably contaminated by the suggestive and coercive nature of Dr. Snow's techniques" rendering them unreliable. *Hadfield v. State*, 788 P.2d 506, 508 (Utah 1990). As the reason for reversal, Justice Durham pointed out the

---

[25] *Id.* at 485.

[26] *Id.* at 477.

[27] *Id.* at 478.

[28] *Id.*

[29] *Id.* at 478–79.

[30] *Id.* at 478.

bizarre factual correlations between those cases and the case resulting in defendant's trial: (1) they all involve a neighborhood "sex ring" of three to twenty families; (2) they all involve members of the same church, including a significant number of religious leaders; (3) they all involve satanic rituals and neighborhood "sex parties"; and (4) in all the cases children taken to [Dr. Snow] for counseling have in turn identified other children and adults in the neighborhood.

*Id.*

The Court also noted that the excluded evidence showed "that several nearly identical allegations exist in several of these cases," including consuming human excrement and "large groups of adults congregating for the purpose of touching naked children." *Id.* at 509. And the excluded evidence indicated that "no known connection exists between any of these cases except for the involvement of Barbara Snow and [her clinic] in the investigations and the inability of law enforcement to discover any corroborating evidence of the group activities (such as photographs, paraphernalia, etc.)." *Id.* And, in a separate proceeding, Justice Stewart of the Utah Supreme Court wrote "[t]he record is replete with instances of the use of coercion, threats, pressure and suggestion by both Dr. Snow and several parents." *State v. Bullock*, 791 P.2d 155, 168 (Utah 1989).

Dr. Snow's lack of professionalism has also been cited by the United States Court of Appeals for the Tenth Circuit. The Tenth Circuit wrote: "The quest for truth in sexual abuse cases is always difficult, particularly when the prosecution's case heavily relies upon the testimony of young victims. In this case, Dr. Snow's disturbing and irresponsible conduct has made this quest especially difficult." *Bullock v. Carver*, 297 F.3d 1036, 1058 (10th Cir. 2002). It concluded "[w]e do not know whether Dr. Snow still counsels children or testifies as a prosecution witness in sexual abuse cases; if she does either, we hope she now follows proper

professional and ethical standards." *Id.*

It appears that Dr. Snow failed to heed the Tenth Circuit's caution. In 2007, the Utah Division of Occupational and Professional Licensing ("DOPL") initiated disciplinary proceedings against Dr. Snow for unprofessional conduct and imposing false memories on patients. Among multiple violations of several sections of the Utah Code, Dr. Snow was charged with convincing a male relative that he was sexually abused by his father. DOPL also charged that she "imposed fictitious memories" in convincing a woman that she was the victim of "satanic abuse and military testing by repeatedly providing details and specifics in order to get [the patient] to begin to visualize this fictitious abuse and testing." DOPL also charged that, in 2006, Dr. Snow "went to [her patient's home] and, without [her patient's] consent, destroyed computer equipment and other personal property with a baseball bat Dr. Snow had taken to" the patient's home. DOPL suspended Dr. Snow's license to practice.[31]

### The Alleged Bountiful Satanic, Ritualistic Sex Abuse Ring

It was after meeting with Dr. Snow that children began levelling accusations against members of the neighborhood in July 1985. After multiple "therapy" sessions with Dr. Snow, Plaintiffs eventually accused the babysitter, her friends, their father, their paternal grandmother, her friends, and several neighbors of satanic ritual abuse.[32] Dr. Snow's business partner subsequently wrote that ten children eventually made allegations of abuse against adolescent baby sitters and adult men and women in the neighborhood. Two of the accused neighbors were

---

[31] A true and correct copy of the DOPL decision is submitted herewith as Exhibit E.

[32] It is clear from Dr. Snow's journal article that this ring was "satanic" in nature. Years later, presumably because SRA had been debunked, Dr. Snow's story changed to remove the satanic elements.

Mr. and Mrs. Miles.  Plaintiffs accused each of these individuals of organizing and participating in a satanic ritual abuse sex ring.

Plaintiffs' initial accusations are, to use the Utah Supreme Court's phrase, "strikingly similar," to accusations made by Dr. Snow's other patients in other neighborhoods.  The accusations originally included many of the same "bizarre" elements including "touching parties," cannibalism, the murder of children and infants, and animal mutilation.[33]

Plaintiffs "remembered" that Mr. and Mrs. Miles abused two of their own daughters.  Both daughters deny those allegations unequivocally and categorically.  They also are prepared to testify that they never witnessed their parents engage in *any* of the actions of which they have been accused.  And they have never seen *any* evidence in their childhood home of any such activities.

Plaintiffs also accused their father of participating in a separate "sex ring" with his mother.  They claim to have been repeatedly sexually abused by their father at their paternal grandmother's house.  They also allege that their paternal grandmother participated in the abuse, and that they were forced to watch their father repeatedly have intercourse with his mother in her home.

The police and the Salt Lake County Attorney's Office conducted an investigation in 1985 and 1986 as soon as the allegations were made.  All of the alleged neighborhood perpetrators, including Mr. and Mrs. Miles, were thoroughly investigated and cleared.  Investigators found absolutely no evidence of *any* sex ring or evidence of *any* abuse by Mr. and

---

[33] It appears that Plaintiffs' counsel has "scrubbed" from the Complaint the satanic and most bizarre aspects of the original allegations.  But Dr. Snow's own article clearly states the presence of those allegations in the original versions of the story.

Mrs. Miles or any of the other accused neighborhood perpetrators.

**Subsequent Written Accounts of Alleged Satanic Bountiful Sexual Abuse Ring**

From 1992 to 2004, Dr. Snow's business partner wrote several accounts purporting to document the Plaintiffs' story. Her writings reveal that Plaintiffs' memories, like those of other children who claimed to be victims of SRA, were planted by their therapist.[34] She notes that just two months before making these allegations, one Plaintiff was evaluated by a child psychologist to determine whether she should skip second grade. That is the exact same time that she was allegedly being routinely abused, raped, and tortured by a large group of people. The psychologist concluded that she "had seldom seen such a healthy child."[35]

Dr. Snow's business partner also documented some of Dr. Snow's coercive and suggestive techniques. For example, she wrote that Dr. Snow took one of the Plaintiffs "into her office and kept saying there was more."[36] After two hours of crying, and apparently before having made any allegation that she was abused, Dr. Snow said: "I'm only going to ask you one more question. You've done so well. You've worked so hard and told us lots of important things. Now tell me, what did Daddy's penis feel like when he put it in your baby hole?"[37]

Indeed, Snow's business partner expressly admitted that Dr. Snow's techniques were suggestive and leading. She wrote the following about her observation of a Dr. Snow interview

---

[34] SRA has been thoroughly debunked by law enforcement and mental health professionals. Accordingly, memories of SRA are false. However, it is equally true that these memories are genuinely believed by the individuals. And the trauma from those implanted memories is all too real.

[35] April Daniels and Carol Scott, Paperdolls - Healing from Sexual Abuse in Mormon Neighborhoods 56 (1992).

[36] *Id.*

[37] *Id.* at 58.

of one of the Plaintiffs:

> The therapist [i.e. Dr. Snow] is good.  I wonder in one part of my brain about leading questions and evidence in court.  Who cares?  The therapist knows we won't let the children testify.  She has said she doesn't care what it takes to have the children tell the story.  There is too much horror in this case.[38]

She also recounts how positive reinforcement was used whenever the children recovered or shared a new "memory" of abuse.  She explains that after the "telling sessions" they held "hero parties" with "games and prizes."[39]  And "[e]very hero child got to have as many toppings on the ice cream as they could get in the dish."[40]

## SUMMARY OF RELEVANT ALLEGATIONS IN COMPLAINT

The Complaint makes the following allegations relevant to the motion to dismiss.  "Defendants DOE 1 MALE DEFENDANT and DOE 2 FEMALE DEFENDANT, along with Perpetrator (who were in the same LDS ward in Bountiful, Utah) committed sexual abuse, when the opportunity allowed, against JANE DOE 1, JANE DOE 2, and, after he reached approximately a year old, JOHN DOE 1, from approximately early 1984 to late 1985 (or early January 1986) in Bountiful, Utah.  At the time of the abuse, Plaintiffs were all under the age of nine."  Compl. ¶ 6.

## MOTION TO DISMISS STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must "state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Thus, the complaint must allege "enough factual matter, taken as true, to make [a] 'claim to relief . . . plausible on its face.'"  *Bryson v.*

---

[38] *Id.*

[39] *Id.* at 55-56.

[40] *Id.*

*Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (ellipsis in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court "accept[s] all well-pleaded facts as true and view[s] them in the light most favorable to the plaintiff."  *Jordan-Arapahoe, LLP v. Bd. of Cty. Comm'rs*, 633 F.3d 1022, 1025 (10th Cir. 2011).  However, a court will not accept as true "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).[41]

    A statute of limitations defense "may be resolved on a Rule 12(b)(6) motion to dismiss 'when the dates given in the complaint make clear that the right sued upon has been extinguished.'"  *Radloff-Francis v. Wyoming Med. Ctr., Inc.*, 524 F. App'x 411, 413 (10th Cir. 2013) (unpublished) (quoting *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980)).  "Statutes of limitation are vital to the welfare of society and are favored in the law."  *Wood v. Carpenter*, 101 U.S. 135, 139 (1879).  "[T]hey protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of

---

[41] The claims of JANE DOE 3, JANE DOE 4, and JOHN DOE 2 ("Plaintiff Group 2") should also be dismissed for the independent reason that they make no allegation that they were abused by DOE 1 MALE DEFENDANT or DOE 2 FEMALE DEFENDANT. Instead, Plaintiff Group 2 asserts that Defendants somehow "encouraged" the Perpetrator  to commit abuse against Plaintiff Group 2, but that assertion is conclusory and insufficient to state a claim. Utah law only imputes liability for this kind of conduct of another where the party is "acting with the mental state required for the commission of an offense who . . . solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense." Utah Code Ann. § 76-2-202 (referenced Utah Code Ann. § 78B-2-308(6)(b)). Such mental state and conduct are wholly lacking.

evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *United States v. Kubrick*, 444 U.S. 111, 117 (1979).

## ARGUMENT

## I.   PLAINTIFFS' CLAIMS ARE TIME-BARRED AND RECENT AMENDMENTS TO THE UTAH CODE ARE INSUFFICIENT TO REVIVE THOSE CLAIMS

### A.   Plaintiffs' Claims Are Barred By the Statute of Limitations In Effect at the Time of the Alleged Abuse

Under Utah law, "a statute of limitations begins to run upon the happening of the last event necessary to complete the cause of action." *Colosimo v. Roman Catholic Bishop of Salt Lake City*, 2007 UT 25, ¶ 14, 156 P.3d 806 (internal quotation marks and citation omitted). The Complaint alleges that the purported abuse took place "[f]rom approximately early 1984 to late 1985 (or early January 1986)." (Compl. ¶ 6.)

Prior to 2016, Utah law provided that actions for sexual abuse must be brought within four years of the victim obtaining the age of majority, or within four years of discovery of the sexual abuse. 2008 Utah Laws Ch. 3 (H.B. 78), UT ST §78B–2–308(2); Utah Code Ann. § 78–12–25.1(2) (West 2007); 1992 Utah Laws Ch. 185 (H.B. 92), UT ST. 78–12–25.1(2); Utah Code Ann. Ch. 12 § 78–12–25(2) (1953). Each of the Plaintiffs' claims became barred by the statute of limitations long before they filed this action.

Plaintiff Jane Doe 1 submits a sworn declaration as Exhibit 1 to Complaint in which she indicates that the alleged abuse occurred "[f]rom approximately 1983 to 1986, while [she] was 5-8 years old." Accordingly, she reached the age of majority in 1996. Plaintiff Jane Doe 2 submits a sworn declaration as Exhibit 2 to the Complaint in which she alleges "from 1982 to 1985, from when I was a newborn to when I was 3 years old, my siblings and I were sexually assaulted." Accordingly, she reached the age of maturity in 2000. Plaintiff John Doe 1 submits a sworn declaration as Exhibit

3 to the Complaint in which he candidly admits that he has "no independent recollection of the events that my sisters have detailed." While he does not specifically say so, assuming he was a newborn through two or three years old at the time of the alleged abuse, he reached the age of majority no later than 2001. Plaintiff Jane Doe 5 submits a sworn declaration as Exhibit 4 to the Complaint in which she alleges "[f]rom about 3-6 years old, my siblings and I were sexually assaulted." Accordingly, she reached the age of majority in 1998. Mother 1 submits a sworn declaration as Exhibit 6 to the complaint in which acknowledges that in "April of 1986, at the request of the investigating police department, I took my children to Dr. MP, a pediatrician at Primary Children's Hospital." Accordingly, four years from the time the youngest plaintiff reached the age of majority is no later than 2005. The statute of limitations accordingly ran with respect to each of the plaintiffs' claims over ten years ago. Moreover, Plaintiffs acknowledge that these claims were investigated in 1986.

### B. Subsequent Amendments to the Statute of Limitations Cannot Permissibly Revive Plaintiffs' Claims

Plaintiffs may assert that amendments to the Utah Code regarding statute of limitations related to sexual abuse revived their time-barred claims, Utah Code Ann. § 78B–2–308, but that assertion is incorrect. Recent amendments to the Utah Code extended the statute of limitations for civil actions based on sexual abuse of a person under 18 years of age to permit claims "brought within 35 years of the victim's 18th birthday," Utah Code Ann. § 78B–2–308(7), and also provided that "[a] victim may file a civil against a perpetrator for intentional or negligent sexual abuse suffered as a child at any time." Utah Code Ann. § 78B–2–308(3). But amendments to a statute of limitation cannot permissibly revive previously-barred claims after the fact. Put differently, "the subsequent passage of an act increasing the period of limitation could not operate to

affect or renew a cause of action already barred." *Roark v. Crabtree*, 893 P.2d 1058, 1062 (Utah 1995).

Notably, this Court has certified the following two questions to the Utah Supreme Court, which questions relate directly to whether Plaintiffs' claims are barred here:

1. "Can the Utah Legislature expressly revive time-barred claims through a statute?

2. Specifically, does the language of Utah Code section 78B–2–308(7), expressly reviving claims for child sexual abuse that were barred by the previous applicable statute of limitations as of July 1, 2016, make unnecessary the analysis of whether the change enlarges or eliminates vested rights?"

(Order of Certification to Utah Supreme Court, *Mitchell v. Roberts*, Case No. 2:16-cv-00843-EJF, Dkt. 37.) The parties have fully briefed and argued those questions in the Utah Supreme Court in Case No. 20170447–SC, and are awaiting the Utah Supreme Court's opinion. Barring a determination by the Utah Supreme Court to the contrary in *Roberts*, to the extent that Utah Code Ann. §78B–2–308(7) purports to revive Plaintiffs' time-barred claims, that provision is invalid under Utah law for the following reasons.

**1. The Utah Supreme Court Has Consistently Held that an Enlargement of a Statute of Limitations Period Cannot Retroactively Revive Already Barred Claims**

The Supreme Court of Utah has *never* permitted the Utah legislature to revive a time-barred claim. The reason is straightforward—"'after a cause of action has become barred by the statute of limitations, the defendant *has a vested right to rely on that statute as a defense*.'" *State v. Apotex*, 2012 UT 36, ¶ 67 (quoting *Roark v. Crabtree*, 893 P.2d 1058, 1062 (Utah 1995) (emphasis in original)). Such a vested right, "'cannot be taken away by legislation . . . or by affirmative act, such as lengthening of the limitation period.'" *Id.* (quoting *Roark*, 893 P.2d at

1062) (alteration in original). [42] Put differently, legislative amendments to the statutes of

limitations simply "cannot resurrect claims that have already expired." *Id.*[43]

The Utah legislature lacks the power to revive time-barred claims under the Utah

Constitution. Among other restraints, the Due Process Clause and the Open Courts Clause of the

Utah Constitution protect against legislative abrogation of the vested right to a statute-of-

limitations defense, as described more fully below.

---

[42] *See also In re Swan's Estate*, 95 Utah 408, 415 (Utah 1938) (noting an amendment lengthening the applicable statute of limitations and explaining "this was after the bar had become effective in this case, and so cannot affect our decision"); *Greenhalgh v. Payson City*, 530 P.2d 799, 802 n.14 (Utah 1975), *superseded on other grounds by* Utah Code Ann. § 78-12-36(1) (Supp. 1975) (quoting *Ireland, supra*) ("The subsequent passage of an act by the legislature increasing the period of limitation could not operate to affect or renew a cause of action already barred.").

[43] The majority of states that have addressed this issue have also determined that legislation cannot revive claims that were time barred. *See Johnson v. Lilly*, 823 S.W.2d 883, 884-85 (Ark. 1992); *Green v. Karol*, 344 N.E.2d 106, 112 (Ind. Ct. App. 1976); *Johnson v. Gans Furniture Indus., Inc.*, 114 S.W.3d 850, 854-55 (Ky. 2003); *Angell v. Hallee*, 92 A.3d 1154, 1157 (Me. 2014); *Overmiller v. D. E. Horn & Co.*, 159 A.2d 245, 247-49 (Pa. Super. Ct. 1960); *Johnson v. Garlock, Inc.*, 682 So.2d 25, 28 (Ala. 1996); *Jefferson Cty. Dept. of Soc. Servs. v. D.A.G.*, 607 P.2d 1004, 1006 (Colo. 1980); *Univ. of Miss. Med. Ctr. v. Robinson*, 876 So.2d 337, 340 (Miss. 2004) (citing Miss. Const. Article 4, § 97; Miss. Code Ann. § 15-1-3 (Rev. 2003)) (state constitution and statute prohibit revival of time-barred claims); *Doe v. Roman Catholic Diocese*, 862 S.W.2d 338, 341-42 (Mo. 1993); *Gould v. Concord Hospital*, 493 A.2d 1193, 1195-96 (N.H. 1985); *Wright v. Keiser*, 568 P.2d 1262, 1267 (Okla. 1977) (citing Okl. Const. Art. V, § 52); *Ford Motor Co. v. Moulton*, 511 S.W.2d 690, 696-97 (Tenn.), *cert. denied*, 419 U.S. 870 (1974) (citing Tenn. Const. Art. 1, § 20); *Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 4 (Tex. 1999); *Stewart v. Darrow*, 448 A.2d 788, 789-90 (Vt. 1982) (citing 1 V.S.A. § 214(b)); *Wiley v. Roof*, 641 So.2d 66, 69 (Fla. 1994); *Doe v. Diocese of Dallas*, 917 N.E.2d 475, 486 (Ill. 2009); *Givens v. Anchor Packing, Inc.*, 466 N.W.2d 771, 773-74 (Neb. 1991); *Colony Hill Condominium I Assoc. v. Colony Co.*, 320 S.E.2d 273, 276 (N.C. Ct. App. 1984); *Kelly v. Marcantonio*, 678 A.2d 873, 883 (R.I. 1996); *Doe v. Crooks*, 613 S.E.2d 536, 538 (S.C. 2005); *State of Minn. ex rel. Hove v. Doese*, 501 N.W.2d 366, 370 (S.D. 1993); *Segura v. Frank*, 630 So.2d 714, 728-31 (La. 1994); *Soc'y Ins. v. Labor & Indus. Review Comm'n*, 786 N.W.2d 385, 396, 399 (Wis. 2010).

### a.    Due Process Clause of the Utah Constitution

Just four years after Utah's statehood, the Utah Supreme Court clarified that vested

rights—like the running of limitations period to bar a claim—cannot be abrogated by the Utah

Legislature under the Utah Constitution. The *Ireland* court cited with approval a dissent from a

decision of the United States Supreme Court in *Campbell v. Holt*, 115 U.S. 620 (1885), in which

Justice Bradley wrote in dissent: "when the statute of limitations gives a man a defense to an

action, and that defense has absolutely accrued, he has a right which is protected by the

fourteenth amendment of the constitution from legislative aggression." *Campbell v. Holt*, 115

U.S. 620, 630 (1885) (Bradley, J., dissenting)) (cited by *Ireland v. Mackintosh*, 61 P. 901, 903

(Utah 1900)). The *Ireland* court noted that that the majority of the state courts that had addressed

the issue sided with Justice Bradley's dissent in *Campbell* and likewise held that "to restore" a

time-barred claim would be "*quite beyond the power of legislation*." *Ireland v. Mackintosh*, 61 P.

901, 903 (Utah 1900) (quoting Thomas M. Cooley, *A Treatise on the Const. Limitations Which*

*Rest upon the Legis. Power of the States of the Am. Union* 454 (6th ed. 1890) (emphasis added)

(internal quotation marks omitted)).

Subsequent decisions from the Utah Supreme Court have further reinforced the notion

that the Utah Constitution protects "'every species of vested right.'" *McGrew v. Indus. Comm'n*,

85 P.2d 608, 610 (Utah 1938) (quoting *Campbell*, 115 U.S. at 630 (Bradley, J., dissenting)); *see*

*also Miller v. USAA Cas. Ins. Co.*, 2002 UT 6, ¶ 39 (same). The Utah Supreme Court also held in

favor of a litigant who argued that "his right to plead a defense of statute of limitations is a

vested right which cannot be impaired without denying him due process of law" in *Roark v.*

*Crabtree*, 893 P.2d 1058, 1061 (Utah 1995). The Utah Constitution affords protections to this vested right, which cannot be abrogated by statute.

### b. Open Courts Provision of the Utah Constitution

Defendants' vested right in their statute of limitations defense is also protected by the Open Courts Clause of the Utah Constitution. The Open Courts Clause provides that "no person shall be barred from prosecuting *or defending* . . . any civil cause to which he is a party." Utah Const. art. I, § 11 (emphasis added). The Open Courts Clause is "complementary" with the Due Process Clause and the two are "related both in their historical origins and to some extent in their constitutional functions. . . . Both act to restrict the powers of the . . . Legislature." *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 675 (Utah 1985); *see generally Waite v. Utah Labor Comm'n*, 2017 UT 86, ¶ 78, --- P.3d --- (Lee, J., concurring) (explaining that "nineteenth-century open courts cases . . . recognize constitutional limits on the *retroactive* application of legislation in a manner abrogating or limiting *vested claims or remedies*") (emphasis in original). Critically, the Open Courts Clause protects the right of litigants "to present claims" as well as "defenses," and to "have them properly adjudicated on the merits." *Daines v. Vincent*, 2008 UT 51, ¶ 46, 190 P.3d 1269 (internal quotation marks and citation omitted).

The Utah Supreme Court has explained that the Open Courts Clause "secures substantive rights." *Tindley v. Salt Lake City Sch. Dist.*, 2005 UT 30, ¶ 13, 116 P.3d 295. Such substantive rights include the right to defend oneself, particularly through the use of a dispositive affirmative defense like a vested right under a statute of limitations.  Plaintiffs may assert that the legislature has authority to abrogate such defenses, but the reality is that "[i]f the legislative prerogative were always paramount, and the Legislature could abolish any or all remedies [or defenses] . . . ,

section 11 [the Open Courts Clause] would be a useless appendage to the Constitution." *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 676 (Utah 1985). Once a right to rely on a statute of limitations defense has vested, the Utah Constitution prohibits the legislature from abrogating that right. For these reasons, the only instances in which the Supreme Court of Utah has permitted retroactive application of an enlargement to a statute of limitations are situations in which the claim had not yet expired. *See, e.g.*, *Del Monte Corp. v. Moore*, 580 P.2d 224, 225 (Utah 1978).

### 2. Express Legislative Intent to the Contrary Is Irrelevant

Plaintiffs may assert that whether the Defendants' rights have vested is not dispositive because here, "the provision is expressly declared to be retroactive." Utah Code Ann. § 68–3–3; *see, e.g.*, *Madsen v. Borthick*, 769 P.2d 245, 253 (Utah 1988) ("It is a long-standing rule of statutory construction that a legislative enactment which alters the substantive law or affects vested rights will not be read to operate retrospectively unless the legislature has clearly expressed that intention.") (citing *Schultz v. Conger*, 755 P.2d 165, 166 (Utah 1988)). But the Utah Supreme Court rejected that very argument in *State v. Apotex Corp.*, 2012 UT 36, ¶67. The state in *Apotex* argued that "the plain language of the amended [legislation] applies the new statute of limitations retroactively," but the Court dismissed that argument, explaining that "after a cause of action has become barred by the statute of limitations the defendant *has a vested right to rely on that statute as a defense* . . . which cannot be taken away by legislation." *Id.* (internal quotation marks and citation omitted) (emphasis and alteration in original).

### C. Plaintiffs' Federal Claim Is A Criminal Statute and Any Civil Claim Would Be Time Barred in Any Event (18 U.S.C. § 2251)

Plaintiffs purport to assert a claim under 18 U.S.C. § 2251. That statute is, however, a criminal statute that these Plaintiffs cannot pursue. Accordingly, this claim must be dismissed. To the extent Plaintiffs were actually seeking to assert a claim under 18 U.S.C. § 2255, such a claim is time barred. The current version of that statute provides a specific statute of limitation that such a civil claim must be brought "not later than 10 years after the date on which the victim reaches 18 years of age." 18 U.S.C. § 2255(b). The version in place when Plaintiffs first raised these claims in the 1980s provided a six-year statute of limitations: "Any action commenced under this section shall be barred unless the complaint is filed within six years after the right of action first accrues or in the case of a person under a legal disability, not later than three years after the disability." *See* U.S. Pub. L. No. 99-500, Title I, § 101(b) [Title VII, § 703(a)], Oct. 18, 1986, 100 Stat. 1783-75; *amended by* U.S. Pub. L. No. 99-591, Title I, § 101(b) [Title VII, § 703(a)], Oct. 30, 1986, 100 Stat. 3341-75. Based on the dates outlined above, the statute of the statute of limitations on any purported federal civil claim ran over a decade ago.

### CONCLUSION

For the foregoing reasons, the Court should grant this Motion and dismiss Plaintiffs' claims against the Miles with prejudice.

DATED:  October 3, 2018.

**RAY QUINNEY & NEBEKER**


*/s/ Samuel C. Straight*
James S. Jardine
Samuel C. Straight
Robert P. Harrington

*Attorneys for Richard and Brenda Miles*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 3rd day of October 2018, I caused to be served via ECF/Email and/or U.S. mail, postage prepaid, a true and correct copy of the foregoing **MOTION TO DISMISS FOR FAILURE TO STATE A CLAM** to the foregoing:

Craig K. Vernon
James, Vernon & Weeks, P.A.
1626 Lincoln Way
Coeur d'Alene, ID 83814

*/s/ Brandy Sears*