# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| HEATHER LEYVA, an individual,<br><br>　　　Plaintiff,<br><br>v.<br><br>BLAINE ROBBINS, a Utah Highway Patrol Trooper,<br><br>　　　Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:18-cv-00121-RJS-CMR<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

This civil rights suit arises out of interactions between Plaintiff Heather Leyva and Defendant Blaine Robbins. At the time of those interactions, Robbins worked as the Utah Highway Patrol's Heavy Duty Towing Rotation Coordinator, and Leyva worked as the receptionist and Heavy Duty Towing Rotation liaison for a towing company. Specifically, Leyva claims Robbins violated her Fourth Amendment right against unreasonable seizures and her Fourteenth Amendment right to be free from sexual harassment by a state actor.

Before the court are the parties' cross-motions for summary judgment. Leyva moves for summary judgment on her Fourth and Fourteenth Amendment claims,[1] and Robbins moves for summary judgment under the doctrine of qualified immunity.[2] Because qualified immunity potentially provides Robbins with immunity from suit, the court begins by evaluating Robbins's Motion. As explained below, the court concludes Robbins is entitled to qualified immunity. For that reason, Robbins's Motion is GRANTED and Leyva's Motion is DENIED.

---

[1] Dkt. 40.

[2] Dkt. 43.

In November 2016, West Coast Towing (WCT) entered into a Towing Rotation Agreement with the Utah Highway Patrol (UHP).[4]  Under the terms of the Agreement, UHP would assign lucrative towing jobs to three companies on UHP's Heavy Duty Towing Rotation (HDTR) and each company would tow crippled vehicles from highways in northern Utah.[5]  Robbins, a UHP Sergeant at the time, served as the "Coordinator" for the Agreement from October 2016 to June 2017.[6]  As the HDTR Coordinator, Robbins communicated frequently with Leyva at WCT and oversaw the performance of the Agreement.[7]  Among other things, the Agreement gave Robbins authority to suspend WCT from the HDTR if WCT or one of its employees violated the terms of the Agreement.[8]

In January 2017, Leyva became a full-time receptionist at WCT, where she also served as WCT's liaison to the UHP.[9]  As WCT's liaison, Leyva worked with Robbins to ensure WCT fulfilled its responsibilities under the Agreement.[10]  As part of her duties, Leyva raised with

---

[3] After carefully reviewing the parties' pleadings and cross-motions for summary judgment, the court has determined the facts cited here are undisputed.  This includes facts asserted by one party but undisputed by the other.  *See* Fed. R. Civ. P. 8(b)(1)(B) ("In responding to a pleading, a party must . . . admit or deny the allegations asserted against it by an opposing party"); *Id.* 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.").  Where applicable, the court cites to parts of the record showing certain facts are undisputed.

[4] Dkt. 43 at 3 ¶ 1, dkt. 53 at 6.

[5] Dkt. 40 at 6–7 ¶ 4, dkt. 40-1 at 32–39.

[6] Dkt. 20 at 4 ¶ 12, dkt. 36 at 4 ¶ 12, dkt. 43 at 4 ¶ 6, dkt. 53 at 6.

[7] Dkt. 20 at 3 ¶ 10, dkt. 36 at 3–4 ¶ 10, dkt. 40 at 6 ¶ 4, dkt. 44 at 2 ¶ 4.

[8] Dkt. 40-1 at 37–38.

[9] Dkt. 20 at 3 ¶ 10, dkt. 36 at 3–4 ¶ 10, dkt. 43 at 3 ¶ 2, dkt. 53 at 6.

[10] Dkt. 20 at 3 ¶ 10, dkt. 36 at 3–4 ¶ 10, dkt. 40 at 6 ¶ 4, dkt. 44 at 2 ¶ 4.

Robbins WCT's concern that UHP disproportionately assigned HDTR towing jobs to WCT's competitors.[11]  She also appears to have attended some HDTR-related tow jobs.[12]

## Leyva and Robbins's Relationship

Leyva first met Robbins on December 18, 2016, when WCT responded to a HDTR job on Utah's Highway 6 in Spanish Fork Canyon.[13]  A few months later, on March 18, 2017, Leyva went on a UHP ride-along with Robbins.[14]  He took Leyva on a tour to his grandparents' house, his favorite fishing holes in Santaquin Canyon, and to dinner at a Wendy's in Provo.[15]  He also made traffic stops, helped with a car fire, and assisted a vehicle that had "gone off  the road in Provo Canyon."[16]  On March 25, 2017, Leyva texted Robbins, "I'm ready for my next ride along lol."[17]  After the ride-along, Leyva and Robbins began communicating frequently via text messages and telephone calls.[18]  Leyva's Fourth and Fourteenth Amendment claims center around events occurring between March 25, 2017, and June 15, 2017.

During that period, Leyva and Robbins texted each other often.  Sometimes their exchanges were work related; other times they were not.[19]  It is difficult to adequately summarize the parties'

---

[11] Dkt. 40 at 7 ¶ 5, dkt. 44 at 3 ¶ 5.

[12] Dkt. 43 at 5 ¶¶ 12–13, dkt. 53 at 12 ¶ 12, dkt. 43-2 at 44.

[13] Dkt. 43 at 5 ¶¶ 12–13, dkt. 53 at 12 ¶ 12.

[14] Dkt. 43 at 6 ¶ 17, dkt. 53 at 12–13.

[15] Dkt. 43 at 6 ¶ 18, dkt. 53 at 12–13.

[16] Dkt. 43 at 6 ¶ 18, dkt. 53 at 12–13.

[17] Dkt. 43 at 7 ¶ 20, dkt. 53 at 13 ¶ 20, dkt. 43-2 at 149.

[18] Dkt. 20 at 4 ¶ 14, dkt. 36 at 4 ¶ 14, dkt. 43 at 7 ¶¶ 24–26, dkt. 53 at 14 ¶ 27.  The parties submitted nearly 150 pages of text communications between March 25, 2017, and June 15, 2017.  The text exchanges are clearly incomplete as many messages are obviously missing, including some in the middle of certain exchanges.  Many of the messages lack dates and times, making it unclear when some of the messages were exchanged.  Because Robbins deleted the messages from his phone, the messages presented to the court came from Leyva's device.  *See* dkt. 43-2.  Though they disagree on what the messages imply, the parties do not dispute the content or authenticity of the text messages.  Dkt. 40 at 7–8, dkt. 44 at 3–6, dkt. 43 at 7–14, dkt. 53 at 14–35.  Nor does either party advance any evidentiary objections concerning the text messages.  Accordingly, the court considers the text messages in its analysis.

[19] *See generally* dkt. 43-2.

countless text message exchanges over the course of three months.  The exchanges are sometimes initiated by Robbins and sometimes initiated by Leyva.  At different times, both suggested to the other that they get together for lunch or exercise.  The parties often texted about fitness-related issues, including food, diet, exercise, and a mutual weight-loss challenge they undertook.[20]  They frequently texted about lunch or dinner plans, and Robbins sometimes invited Leyva out for drinks.[21]  Although it is unclear how often the parties followed through on their lunch or dinner plans, it is clear they followed through at least occasionally.[22]  During these meals, they addressed business-related issues.[23]

Later in the relevant period, Robbins texted Leyva about her physical appearance and her attractiveness.[24]  For instance, on May 31, 2017, the following exchange occurred:

> Robbins: "Did ya hear that?"
> Leyva: "Nope I stepped away from my phone. Whatcha got!?"
> Robbins: "I said, Salt lake could you get a hold of west coast towing and tell their Secretary she's pretty darn sexy and doesn't need to loose any weight….. (winking emoji)"
> Leyva: "What!?! You did not!!!!"
> Robbins: "Hehe, just seeing if you were paying attention"
> Leyva: "You wouldn't do that!!!"
> Robbins: "Haha maybe not however……….. I am the Sgt, and I'm always right!!!!!"
> (missing text)
> Robbins: "yep….for sure, just ask me…"
> Leyva: "Ask you what you know, or if you are always right?!?"
> Robbins: "Whichever…. I KNOW I'm always RIGHT. Especially when it come to that…."
> Robbins: "Hehehe"
> Robbins: "Trust me on this one."
> Leyva: "Lol. Well I appreciate that but, I know it needs to happen!"

---

[20] Dkt. 43-2 at 12–16, 28–33, 35–41, 44, 48– 50, 54–56, 60–61, 64–65, 68, 71, 79–80, 83, 85–87, 89–94, 100–01, 103, 107, 110–11, 120–21, 123–26, 129, 132–33, 136–37, 141–47.

[21] Dkt. 43-2 at 16, 22, 38, 76, 107.  It is not clear from the record whether the parties ever got drinks together.

[22] Dkt. 53 at 17, dkt. 43-3 at 111:23–112:24, dkt. 64 at 5–6.

[23] Dkt. 53 at 17, dkt. 43-3 at 111:23–112:24, dkt. 64 at 5–6.

[24] Dkt. 43-2 at 34, 51, 109–10, 112–13.

Robbins: "If it makes you feel better about you, then do it."
Robbins: "Trust me I know how guys think. (weird I know) and you are a 10."
Leyva: "(blushing emoji) thank u"[25]

On at least four occasions, Robbins invited himself over to Leyva's home,[26] but never went to her home.[27] He also referred to Leyva as "sweet pea," "skinny lady," "my lady," "hot blond chick," and "babe."[28] Some of Robbins's text messages included sexual overtures and innuendos,[29] and Leyva also initiated or reciprocated messages with sexual overtures and innuendos.[30] For example, the following exchange occurred on March 31, 2017:

Robbins: "(Now don't get mad at me). I decided to take tonight off because we have plenty of man power, so hopefully I can get a run in…. I need to stay on top of it. I'm up to 5 miles and I don't want to lose it."
Leyva: "Lol oh how would it be!?!?"
Robbins: "Hahaha, sorry. My much much better half begged me"
Leyva: "Lol well in that case I forgive u! Hopefully you get something good out of it (winking emoji with tongue out)"
Robbins: "MY THOUGHTS EXACTLY!!!!! Hahaha. However I've learned not to get my hopes up…"
Leyva: "Hahhahaha they say it's a great way to burn calories lol"
Leyva: "(I mean… 'I heard') (zipped mouth emoji, pensive emoji)"
Robbins: "Hey!!!! That could be something we could work together on!!!!!(sly emoji)"
Robbins: "Running I meant….."
Leyva: "LMAO"
Robbins: "What you don't like to run?"
Leyva: "Run (running emoji) Lol ya I like to run"
Robbins: "What were you thinking? (sly emoji)"
Leyva: "Hahahahah"
Leyva: "Probably shouldn't elaborate on that (laughing with tears emoji)"
Robbins: "And Trust me…..I'm not a LAM"
Leyva: "LAM? Help me out I'm an old lady idk what that is"

---

[25] Dkt. 43-2 at 112–13 (errors in original).

[26] Dkt. 43-2 at 29, 90, 104, 145.

[27] Dkt. 43 at 7 ¶ 23, dkt. 43-3 at 43 ¶¶ 23–25, dkt. 53 at 14–15.

[28] Dkt. 43-2 at 18, 25, 38, 50, 69, 79, 86, 111, 128.

[29] Dkt. 43-2 at 19, 22, 28–31, 34, 36, 51, 53–54, 81–82, 84, 86–87, 109–10, 112–13, 118–19, 122–24, 128.

[30] Dkt. 43-2 at 54, 120, 122–24.

(missing texts)

Robbins: "OH….haha haha…. Maybe idiot works better for me…"

Leyva: "Lol"

Robbins: "Well… You wouldn't do that either It would be the BEST thing that has ever happened to you…… (open mouth emoji)"

Leyva: "Wait!!!!! What are we talking about again!?!? The laughing or the running!?"

Leyva: "Or whatever else we weren't talking about lol"

Robbins: "Haha haha use your imagination.. J/k"

Robbins: "I'm just being stupid. Erase and start over…."

Robbins: "It's fun to day dream…"[31]

And the following exchange appears to have occurred on May 1, 2017:

Leyva: "I haven't had fast food that wasn't salad since 2 weeks before my ride along"

Leyva: "You can do it"

Leyva: "I hung up a bikini in my closet that I have to look at everyday…. I will get into it this summer"

Robbins: "That's a great idea, I'll do the same thing.  Loan me one of your bikinis to hang up…..hehe"

Leyva: "Ok, I'm sure you wife will love that!"

Robbins: "Hahaha, ya maybe not….. Again the mind thing, I will invision you in it. SERIOUS MOTIVATION!!!!"[32]

On three occasions, Robbins asked Leyva to send him pictures of herself. [33]  Although Leyva sent pictures in response to Robbins's first two requests, she did not send a picture in response to Robbins's request for her "sexiest picture."[34]  Instead, the following exchange occurred:

Leyva: "So what's up? U still grumpy pants?!?"

Leyva: "lol I'll take that as a yes!! Hahah"

Robbins: "And yes I am….. Because….I didn't get to see you long enough…"

Leyva: "Well… how can we remedy that??"

Robbins: "I could think of many different ways and positions. Unfortunately we can't tonight. I'm done here at 10 then its off to bed. I have PT test in the morning at 7 grrrrrr."

---

[31] Dkt. 43-2 at 122–25 (errors in original).

[32] Dkt. 43-2 at 54–55 (errors in original).

[33] Dkt. 43-2 at 30, 53–54, 99–100.

[34] *See* Dkt. 43-2 at 30, 53–54, 99–100.

Leyva: "Lol. Ok maybe tomorrow. Good luck with the testing!"
Robbins: "I guess you could always send me a you best sexiest picture. That might help….."
Robbins: "(sly emoji)"
Robbins "Ya know…..only if ya wanted."
Leyva: "lol I don't have any of those!!"
Leyva: "If u want to meet up on your lunch (dinner) tomorrow… let me know!"
Robbins: "Ok, your place????????!!!!!!!"
Robbins: "OH, THAT'S A GREAT IDEA!!!"
Robbins: "OK, ILL BE THERE."
Leyva: "Lol! Nothing special at my place!"
Robbins: "UMMM you're there, right? What more special than that? Nothing I say…"
Leyva: "Not that special lol"
Robbins: "You're very special to me."
Robbins: "Just saying"
Robbins: "Always remember that"
Leyva: "Ok"
Robbins: "Did we just have a moment?"
Robbins: "Hehehe"
Leyva: "lol I think u did hahahah"
Robbins: "Ya, you're probably right…. (winking emoji)"
Leyva: "So tomorrow when u are on, let me know…. I'll meet ya. What time do u usually do dinner?"[35]

Many of the messages Robbins sent Leyva were unwanted and upsetting to her.[36] Despite this, Leyva asserts she "politely attempted to deflect" or "humor" Robbins to avoid upsetting him because she believed Robbins "controlled [WCT's] access to lucrative heavy duty towing jobs."[37] Leyva frequently texted Robbins for help addressing issues with the towing rotation, and Robbins occasionally obliged.[38] The two discussed such issues on May 26, 2017, and May 31, 2017:

Leyva: "What else will u need to get WC towing & transport added? Lmk. Stay safe, I'm sure it will be a busy weekend!!"
Leyva: "I'm getting pressure from both sides (woods & Rob) I was pulled in the office this morning because they are talking about putting Dan back on the rotation

---

[35] Dkt. 43-2 at 28–31 (errors in original).

[36] Dkt. 40 at 7 ¶ 9, 8 ¶ 14; dkt. 44 at 4.

[37] Dkt. 40 at 7–8 ¶ 9, dkt. 40-1 at 5, dkt. 44 at 4–5.

[38] Dkt. 43-2 at 19–21, 42, 46–47, 55–56, 62–63, 87–89, 91–92, 94–96, 100–02, 117.

stuff because I am not making things happen with hywy & their new WC company.
Did you not get the packet I turned on?? I'm sweatin here…. a little help???"
Robbins: "I'll have you on rotation today"
Leyva: "(thumbs up emoji)"
Robbins: "I don't have the packet with me at the moment. What's the contact phone #?"
Robbins: "And it area 1 and 2 only correct?"
Leyva: "(picture of letter) Area 1"
Leyva: "(picture of letter) Area 2"
Robbins: "Ok, so you can stop stressing out. I just called dispatch and you're now on the rotation."
Leyva: "Thank you"[39]

Robbins's responses only related to him putting a "new WC company" on the light duty rotation.[40]

Two weeks later, on June 15, 2017, Leyva texted Robbins to express concern that "the rotation [was] NOT working the way it should."[41] Robbins called Leyva later that day to discuss her concerns and told her to "not give [him] a reason not to like [her]."[42] Although the record is not clear on this point, it appears this call was the last time the parties' communicated.[43]

### The Traffic Stop

Early in their interactions, Robbins used his UHP vehicle to pull Leyva over.[44] On Sunday, April 2, 2017, around 5:00 PM, Robbins initiated the following text conversation with Leyva:

Robbins: "What a great start to my day!!! (sly emoji)"
Leyva: "LOL. Me and my gigantic yellow jacket!?!"
Robbins: "Heck yes, even better…haha"
Leyva: "Lol! Well find two other heavys for the other two on rotation and get me another one by midnight and I (unreadable) Do you know if this guy has insurance because he heard it was revoked over the radio"
Robbins: "That, or I'll just make a house call"

---

[39] Dkt. 43-2 at 19–22 (errors in original).

[40] Dkt. 43 at 13–14, dkt. 43-5 (Robbins Decl.) at 4 ¶ 10, dkt. 53 at 33.

[41] Dkt. 43-2 at 5–6.

[42] Dkt. 40 at 9 ¶ 20, 40-1 at 6 ¶ 19, and 44 at 6–7.

[43] Dkt. 43 at ¶26, dkt. 53 at 14.

[44] Dkt. 20 at 5 ¶ 23, dkt. 36 at 5 ¶ 23, dkt. 40 at 9 ¶¶ 17–18, dkt. 44 at 6 ¶ 18, dkt. 43 at 14–15, dkt. 43-5 (Robbins Decl.) at 7–8, dkt. 53 at 37–40.

Robbins: "Let me find put"
Robbins: "Out"
Leyva: "Lol sounds good"
Robbins: "I just talk to Josh, he said it all showed valid.."
Leyva: "Perfect. Thanks :)"
Robbins: "Could you forward me that picture"
Leyva: "Standby I'm on the freeway"
Robbins: "No problem"
Robbins: "Where? I'll come pull you over."
Leyva: "286"
Robbins: "286? Where ya headed?"
Leyva: "Bluffdale I'll be back in 20 minutes"
Robbins: "I'll be waiting 285. You in the what car."
Robbins: "White car"[45]

The number Leyva texted Robbins was the mile marker number on the freeway.[46] Although Leyva was not driving her personal vehicle,[47] Robbins found her, turned on his UHP vehicle's emergency lights without activating the siren, and pulled her over.[48] The traffic stop occurred "on 2100 North in Lehi" and not on the freeway.[49] According to Robbins, the purpose of the traffic stop was "a joke between friends."[50] Although Leyva was driving a WCT vehicle with a cracked windshield,[51] Robbins admits he did not notice the cracked windshield until after he initiated the stop and that he did not stop Leyva to investigate the windshield.[52]

After noticing the UHP vehicle and its emergency lights, Leyva pulled over.[53] Leyva did not know Robbins was in the UHP vehicle until "he approached the window of the passenger side

---

[45] Dkt. 43-2 at 104–06 (errors in original).

[46] Dkt. 43-3 (Leyva Depo.) at 51 ¶¶ 11–12.

[47] Dkt. 43 at 15 ¶ 61, dkt. 53 at 37–38.

[48] Dkt. 20 at 5 ¶ 23, dkt. 36 at 5 ¶ 23, dkt. 40 at 9 ¶ 17, dkt. 40-1 at 5–6, dkt. 43 at 14 ¶ 60, dkt. 53 at 37–38.

[49] Dkt. 53 at 37–38, dkt. 64 at 6, dkt. 43-3 (Leyva Depo.) at 51:12–13. The record provides no clear explanation for how Robbins located Leyva off of the freeway to initiate the traffic stop. *See* dkt. 43-5 (Robbins Decl.) at 7 ¶¶ 27–31.

[50] Dkt. 43-5 (Robbins Decl.) at 8 ¶ 33.

[51] Dkt. 43-5 (Robbins Decl.) at 7–8; dkt. 43-9 at 2.

[52] Dkt. 43-5 (Robbins Decl.) at 7–8.

[53] Dkt. 43 at 15 ¶ 63; dkt. 43-3 (Leyva Depo.) at 54:2–12, dkt. 53 at 37–38.

of [her] vehicle,"[54] but she did take a picture of the UHP vehicle once she stopped.[55] Leyva's picture shows the traffic stop occurred around 6:55 PM.[56]

After approaching Leyva's vehicle, Robbins declined her offer of identification[57] and told her, "I don't need to see that, just seeing you is enough."[58] Robbins did not cite Leyva for the cracked windshield.[59] Instead, the parties spoke for nearly ten minutes before going their separate ways.[60]

At 9:04 PM that night, Robbins initiated the following exchange:

Robbins: "Just heard there was a disturbance call at your house. What's the address and I'll come check it out….. (smiling emoji with tongue out)"
Leyva: "Haha. No disturbance. I am beat, going to bed early. Be safe out there we will talk soon."
Robbins: "Ah dang!! Ok, sleep well."[61]

The next morning, Robbins texted Leyva a picture of a scale, indicating his weight.[62] Six hours later, Leyva responded, "Good job (hand clap emoji)."[63] Robbins replied, "There you are. I thought you were a little sore at me for pulling you over yesterday."[64] Concluding the exchange, Leyva answered, "Nah."[65]

---

[54] Dkt. 43-3 (Leyva Depo.) at 54–55.

[55] Dkt. 43-5 (Robbins. Decl.) at 8 ¶ 34, dkt. 43-9 at 2.

[56] Dkt. 43-9 at 2.

[57] Dkt. 43 at 15 ¶¶ 63, 65; dkt. 43-3 (Leyva Depo.) at 54:16–23; dkt. 53 at 37–38.

[58] Dkt. 43-3 (Leyva Depo.) at 54:20–21.

[59] Dkt. 43 at 15 ¶ 65, dkt. 43-3 (Leyva Depo.) 55:5–6, dkt. 53 at 38–39.

[60] Dkt. 43 at 15 ¶¶ 63–64, dkt. 53 at 37–38.

[61] Dkt. 43-2 at 104.

[62] Dkt. 43-2 at 103.

[63] Id.

[64] Id.

[65] Id.

Approximately one month after the traffic stop, in May 2017, Leyva reported to her boss that Robbins was sexually harassing her.[67] Leyva's complaint was reported to the UHP,[68] and an internal investigation began in June 2017.[69] The internal investigation reviewed Robbins's text communications with Leyva, the traffic stop on April 2, 2017, and Robbins's actions as the HDTR Coordinator.[70] In part, the investigation concluded (1) Robbins did not unfairly administer the HDTR program, (2) Robbins's intentions in taking Leyva on the ride along were "to further [his] desired relationship with [Leyva] rather than work related," (3) Robbins pulled Leyva over "without probable cause just to see [Leyva] and further advance [his] desired relationship," (4) Leyva "had not violated any laws" when Robbins pulled her over, and (5) Robbins sent "unprofessional communications" to Leyva with his state-issued cell phone.[71] As a result of the investigation, Robbins was demoted and removed as the HDTR Coordinator on November 7, 2017.[72]

## Procedural History

Leyva initiated this action against Robbins on February 7, 2018.[73] Leyva's Amended Complaint includes four causes of action: (1) a Fourteenth Amendment sexual harassment claim,

---

[66] Although Robbins challenges Leyva's characterization of what the internal investigation concluded, Robbins raises no evidentiary objections concerning the investigation's findings. *See* dkt. 44 at 8–10. This court therefore considers the internal investigation's final report. *See* Dkt. 55-1 (SEALED).

[67] Dkt. 40 at 9 ¶ 21, dkt. 40-1 at 6 ¶ 10, dkt. 44 at 7 ¶ 21.

[68] Dkt. 40 at 9 ¶¶ 21–22, 10 ¶ 24; dkt. 44 at 7–8.

[69] Dkt. 43 at 17–20, dkt. 53 at 41–49.

[70] Dkt. 43 at 17 ¶ 77, 19–20 ¶¶ 85–90; dkt. 53 at 41, 45–49.

[71] Dkt. 55-1 at 1–3 (SEALED).

[72] *Id.* at 4–5 (SEALED), dkt. 40 at 11 ¶ 29, dkt. 44 at 10 ¶ 29, dkt. 43 at 18 ¶ 81, dkt. 43-7 (Robbins Depo.) at 24:1–22, dkt. 53 at 42–43.

[73] Dkt. 2.

(2) a Fourth Amendment illegal seizure claim, (3) a Utah state common law claim for intentional infliction of emotional distress, and (4) a Utah state constitutional claim for violation of the equal protection clause.[74] The parties filed competing motions for summary judgment.[75] Leyva moved for summary judgment on all of her claims against Robbins,[76] and Robbins moved for summary judgment on those claims under the doctrine of qualified immunity.[77] At oral argument, however, Leyva dismissed her Utah state law claims.[78] Leyva's Fourth and Fourteenth Amendment claims remain, and the court now takes up the parties' Motions, beginning with Robbins's assertion of qualified immunity.

## LEGAL STANDARDS

"Under 42 U.S.C. § 1983, a person acting under color of state law" shall be liable for violating another's "rights, privileges, or immunities secured by the Constitution."[79] Although § 1983 creates "a federal cause of action for damages to vindicate alleged violations of federal law committed by individuals acting under 'color of state law,'" it "creates no substantive civil rights, only a procedural mechanism for enforcing them."[80] Thus, "[t]he elements of a § 1983 claim are: (1) The plaintiff was deprived of a right secured by the Constitution or laws of the United States, and (2) defendant deprived them of this right acting under color of state law."[81]

---

[74] Dkt. 20 at 7–14.

[75] Dkt. 40, dkt. 43.

[76] Dkt. 40.

[77] Dkt. 43.

[78] Dkt. 67 at 42:18–19.

[79] *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019) (quoting 42 U.S.C. § 1983).

[80] *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995) (citations omitted).

[81] *Maestas v. Lujan*, 351 F.3d 1001, 1012 n.1 (10th Cir. 2003) (citation omitted).

An "[i]ndividual defendant[] named in a § 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law."[82] This defense is meant to "not only protect[] public employees from liability, but also protects them from the burdens of litigation."[83] In practice, a motion for summary judgment based on qualified immunity is subject to a different standard than other motions for summary judgment.[84]

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion."[85] Specifically, the plaintiff must demonstrate "(1) that the [defendant] violated a statutory or constitutional right, *and* (2) that the right was 'clearly established' at the time of the challenged conduct."[86] "[I]f the plaintiff fails to establish either prong of the two-pronged qualified immunity standard, the defendant prevails on the defense"[87] and "the court must grant the defendant qualified immunity."[88] But if the plaintiff satisfies both prongs, the "defendant then bear[s] the traditional burden of the movant for summary judgment—showing 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law."[89] A "genuine issue" exists "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way,"

---

[82] *Doe*, 912 F.3d at 1289 (citation omitted).

[83] *A.M. v. Holmes*, 830 F.3d 1123, 1134 (10th Cir. 2016) (citation and brackets omitted).

[84] *See id.* ("In light of these purposes, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions.") (citation and quotation marks omitted); *see also Nelson v. McMullen*, 207 F.3d 1202, 1205–06 (10th Cir. 2000) ("However, we review summary judgment decisions involving a qualified immunity defense somewhat differently than other summary judgment rulings.") (citation, quotation marks, and brackets omitted).

[85] *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009).

[86] *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (citation omitted).

[87] *A.M.*, 830 F.3d at 1134–35 (citations omitted).

[88] *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citation omitted).

[89] *Nelson*, 207 F.3d at 1206 (quoting *Albright v. Rodriquez*, 51 F.3d 1531, 1535 (10th Cir. 1995)).

and "[a]n issue of fact is material if under the substantive law it is essential to the proper disposition of the claim."[90]

Under qualified immunity's first prong, a plaintiff "must articulate the clearly established constitutional right and the defendant's conduct which violated the right with specificity."[91] And at summary judgment, the plaintiff's factual assertions "must find support in the record."[92] To determine whether a plaintiff meets this burden, the court "construe[s] the facts in the light most favorable to the plaintiff as the nonmoving party."[93] This "usually means adopting . . . the plaintiff's version of the facts unless that version is so utterly discredited by the record that no reasonable jury could" believe it.[94]

Under qualified immunity's second prong, "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[95] "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."[96]

To determine if a constitutional right is clearly established, the court may "not define the relevant constitutional right at a high level of generality."[97] Instead, it must determine whether the reasonable application of controlling law can be applied and "particularized to the facts of the

---

[90] *Split Rail Fence Co., Inc. v. United States*, 852 F.3d 1228, 1237 (10th Cir. 2017) (citations omitted).

[91] *Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995) (citation omitted).

[92] *Quinn*, 780 F.3d at 1004 (citation omitted).

[93] *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (citations omitted).

[94] *Kendall v. Olsen*, 727 Fed. App'x 970, 973 (10th Cir. 2018) (unpublished) (citations omitted), *cert. denied*, 139 S. Ct. 183 (2018).

[95] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation and quotation marks omitted).

[96] *Id.* (citation and quotation marks omitted).

[97] *Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018) (citation and quotation marks omitted).

case."[98]  This requires a plaintiff to show "that a particular right was clearly established at the time of the challenged conduct."[99]  And a plaintiff meets this burden by identifying (1) "an on-point Supreme Court" decision, (2) a "published Tenth Circuit decision," or (3) by demonstrating that "the clearly established weight of authority from other courts [ ] have found the law to be as [she] maintains."[100]

But because "officials can still be on notice that their conduct violates established law even in novel factual circumstances," plaintiffs are not required to identify a case that is directly on point or that shares identical facts with her case.[101]  Instead, a plaintiff must identify a case that involves "*materially similar conduct*" or, absent similar conduct, show that general precedents apply "with *obvious clarity* to the conduct at issue."[102]  To aid in this analysis, the Tenth Circuit has "adopted a sliding scale to determine when law is clearly established.  'The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'"[103]  Thus, "[a]lthough the very action in question does not have to have previously been held unlawful, in the light of pre-existing law the unlawfulness must be apparent."[104]

---

[98] *Id.*; *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1214 (10th Cir. 2019) (explaining "the clearly established law must be 'particularized' to the facts of the case.") (citation omitted); *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established.") (citation and quotation marks omitted).

[99] *A.M.*, 830 F.3d at 1135.

[100] *Id.* (second alteration in original) (citations omitted).

[101] *Id.* at 1135–36.

[102] *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017) (citations and quotation marks omitted), *cert. denied*, 139 S. Ct. 5 (2018).

[103] *A.M.*, 830 F.3d at 1135–36 (citations omitted).

[104] *Albright*, 51 F.3d at 1535 (citation and quotation marks omitted).

When addressing a qualified immunity defense, this court may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[105]

## ANALYSIS

Robbins argues he is entitled to qualified immunity both on Leyva's Fourth and Fourteenth Amendment claims. Viewing the facts in a light most favorable to Leyva, the court concludes a reasonable jury could find that Robbins violated Leyva's constitutional rights.[106] The court nonetheless grants Robbins qualified immunity on each claim because the applicable law was not clearly established at the time of the alleged constitutional violations.

### I. Qualified Immunity and Leyva's Fourth Amendment Claim

Robbins argues he is entitled to qualified immunity on Leyva's Fourth Amendment claim because Leyva consented to the stop and Leyva's cracked windshield provided reasonable suspicion for the stop.[107] The undisputed facts support the conclusion that Robbins violated Leyva's Fourth Amendment right to be free from unreasonable seizures. But the precedent concerning consent in the context of this case was not clearly established at the time of the traffic stop, and Robbins is therefore entitled to qualified immunity.

---

[105] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[106] *Cf. McCoy v. Meyers*, 887 F.3d 1034, 1049 (10th Cir. 2018) ("Viewing the evidence in the light most favorable to Mr. McCoy, a reasonable jury could conclude that the post-restraint force violated his Fourth Amendment rights.").

[107] *See* dkt. 43 at 33–36.

### a. Robbins violated Leyva's Fourth Amendment right to be free from an unreasonable seizure

"The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[108]  Under Fourth Amendment precedent, there are three types of police-citizen encounters:

> (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.[109]

The parties spend the majority of their briefs arguing about whether the traffic stop was consensual and thus not subject to the Fourth Amendment's "reasonableness" requirement.[110] Although the undisputed facts raise serious concerns about whether Leyva consented to the traffic stop,[111] Robbins's actions preclude finding that she did.  Consent is absent where "an encounter between an officer and a citizen [] involve[s] the use of physical force or [a] show of authority on

---

[108] *United States v. Orduna-Martinez*, 561 F.3d 1134, 1137 (10th Cir. 2009) (quotation marks and brackets omitted) (quoting U.S. Const. amend. IV).

[109] *United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006) (citation omitted).

[110] Dkt. 43 at 33–36, dkt. 53 at 56–60, dkt. 64 at 16–17.

[111] Before the traffic stop, Leyva informed Robbins she was on the freeway, and Robbins replied, "Where? I'll come pull you over." Dkt. 43-2 at 105.  Leyva replied with the nearest mile marker. *Id.* at 104.  Robbins then asked, "Where ya headed?" *Id.* (errors in original).  And Leyva answered, "Bluffdale I'll be back in 20 minutes." *Id.* (errors in original).  Robbins responded, "I'll be waiting 285.  You in the what car.  White car[.]" *Id.*  Leyva did not respond. *Id.* Based on this conversation, Leyva arguably gave implied consent to the traffic stop before it took place because a reasonable person in Leyva's position would have felt free to decline to answer Robbins's questions. *See United States v. Latorre*, 893 F.3d 744, 756 (10th Cir. 2018) ("We apply a two-part test for voluntary consent: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given.") (citation and quotation marks omitted); *see also United States v. Fox*, 600 F.3d 1253, 1258 (10th Cir. 2010) (explaining the critical inquiry in a consent analysis is "whether the police conduct would have communicated to a reasonable person that she was not at liberty to ignore the police presence and go about her business.") (citation, quotation marks, and brackets omitted).  But as addressed *infra* at 21–23, it is not clear how, or if, this consent analysis interacts with the law governing the constitutionality of a traffic stop.

the part of the officer such that a reasonable person would not feel free to decline the officer's request or terminate the encounter."[112]

Here, Leyva did not recognize Robbins when he used his UHP vehicle's emergency lights to stop her.[113] No reasonable citizen would feel free to disregard a UHP vehicle with its emergency lights activated.[114] Moreover, Utah law *requires* motorists to pull over when a law enforcement officer gives a visual signal, like emergency lights.[115] Additionally, there is serious doubt that a citizen can consent to a traffic stop because "*[t]raffic stops are seizures* subject to the Fourth Amendment's requirement for reasonableness."[116] Thus, the traffic stop was not a consensual police-citizen encounter, and Leyva did not consent—and likely could not have consented—to the traffic stop.

Because Robbins's argument that Leyva consented to the traffic stop fails, the court now turns to whether the traffic stop was nevertheless reasonable and thus constitutional. A traffic stop is reasonable if (1) "the officer's action was justified at its inception" and (2) the officer's actions during the stop are "reasonably related in scope to the circumstances which justified the interference in the first place."[117] The court need go no further than the first inquiry to conclude

---

[112] *Lopez*, 443 F.3d at 1283 (citation omitted).

[113] Dkt. 40 at 9 ¶ 17, dkt. 44 at 5–6.

[114] *See United States v. Gaines*, 918 F.3d 793, 796–97 (10th Cir. 2019) (explaining that activated police lights weighs against a consensual encounter because a reasonable person would not have felt free to disregard emergency lights when, "[u]nder Kansas law, motorists must stop whenever a police officer flashes his or her emergency lights.") (citation omitted); *see also California v. Hodari D.*, 499 U.S. 621, 628 (1991) (noting that police cars with flashing emergency lights constitute a show of authority).

[115] *See* Utah Code Ann. § 41-6a-210(1) (requiring motorists to pull over when they "receive[] a visual or audible signal from a law enforcement officer to bring the vehicle to a stop").

[116] *United States v. Gurule*, 935 F.3d 878, 882–83 (10th Cir. 2019) (emphasis added) (citation omitted), *cert. denied*, 2020 WL 981935 (2020).

[117] *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

Robbins violated Leyva's right to be free from an unreasonable seizure because the traffic stop lacked justification at its inception.

"A traffic stop is reasonable at its inception if the detaining officer, at the very least, reasonably suspects the driver has violated the law."[118] "[T]he level of suspicion required to support a traffic stop is 'considerably less' than proof of wrongdoing by a preponderance of the evidence'" and requires "only a minimal level of objective justification."[119] In assessing the reasonableness of the stop, the officer's "subjective intent or good faith" are irrelevant.[120]

The undisputed facts confirm Robbins lacked reasonable suspicion that Leyva had violated the law when he initiated the traffic stop. Although Robbins asserts he noticed the cracks on Leyva's windshield when he "began to pull [her] over," he admits his "reason for pulling her over was a joke between friends" and not "to investigate a cracked windshield."[121] The UHP's internal investigation also concluded Leyva "had not violated any laws" and that Robbins pulled her over "without probable cause just to see her and further advance [his] desired relationship."[122] Colonel Mike Rapich, a UHP employee who investigated the traffic stop, testified that Robbins failed to articulate a legal basis for the stop.[123] Further, it is undisputed that Robbins did not articulate a legal reason for the stop, he did not require Leyva to provide her license and registration, and he

---

[118] *United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006).

[119] *Orduna-Martinez*, 561 F.3d at 1137 (citations omitted).

[120] *Id.* (citation omitted).

[121] Dkt. 43-5 (Robbins Decl.) at 6–7.

[122] Dkt. 55-1 at 1, 3 (SEALED).

[123] Dkt. 43-12 (Colonel Rapich Depo.) at 33–34.

told her that he just wanted to see her.[124]  Finally, Robbins issued no citations or warnings to Leyva for her broken windshield or anything else.[125]

Accordingly, the court concludes Robbins violated Leyva's Fourth Amendment right to be free from unreasonable seizures when he stopped her on April 2, 2017.

### b. The law concerning nonconsensual police-citizen encounters was not clearly established

Despite Robbins's unconstitutional conduct in pulling over Leyva, the court concludes the law was not clearly established concerning this particular fact scenario.  If Robbins is entitled to qualified immunity under this prong, two questions must be answered in the affirmative: (1) was the law clearly established that the traffic stop itself violated the Fourth Amendment, and (2) was the law clearly established that the traffic stop did not constitute a consensual police-citizen encounter?  Although the court answers the first question in the affirmative, it cannot do so with the second question.  Robbins is therefore entitled to qualified immunity on Leyva's Fourth Amendment claim.

Before addressing each question, certain principles under this prong of qualified immunity warrant repeating.  First, "[t]he plaintiff bears the burden of citing to [the court] what [s]he thinks constitutes clearly established law."[126]  Second, the plaintiff may meet this burden by citing to precedent that "involves *materially similar conduct* or applies with *obvious clarity* to the conduct at issue."[127]  Third, a plaintiff's citation to cases that merely apply "hornbook Fourth Amendment

---

[124] Dkt. 43-3 (Leyva Depo.) at 54–55; dkt. 43-5 (Robbins Decl.) at 6–7; dkt. 55-1 at 1, 3–4 (SEALED).

[125] Dkt. 43-5 (Robbins Decl.) at 6 ¶ 30.

[126] *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) (citation omitted).

[127] *Apodaca*, 864 F.3d at 1076 (citation and quotation marks omitted).

principles to an unrelated factual context" generally fails to satisfy the burden.[128]  And fourth, "[w]hile there does not have to be a case that is factually identical, it must still be *apparent to a reasonable officer* in light of pre-existing law that his conduct was unlawful."[129]

Turning to the first question of whether the traffic stop itself violated clearly established law, Leyva cites cases applying general Fourth Amendment principles in factual scenarios that are not analogous to this case.[130]  Although she does not explain how any of the cases she cites can be particularized to this case, the law governing traffic stops was nevertheless clearly established when Robbins pulled over Leyva.  At that time, it  was clear that a Fourth Amendment violation occurs when an officer initiates an investigative detention without reasonable suspicion or unreasonably extends the scope of the detention beyond its initial justification.[131]  These rules apply "with *obvious clarity*"[132] to the traffic stop at issue here, where Robbins seized Leyva without reasonable suspicion and extended the stop for the purpose of a "goofy, funny, joke between friends."[133]  Thus, the court agrees with Leyva that "[i]t is clear from the facts of this case that without the 'consent' alleged by Robbins, there was admittedly no reasonable suspicion."[134]  But the question of how consent plays into this analysis, if at all, is far from clear.

Turning now to that question of whether the law clearly established that the traffic stop did not constitute a consensual police-citizen encounter, the court concludes Leyva has not met her burden.  Significantly, Leyva has not cited precedent involving a nonconsensual police-citizen

---

[128] *See Quinn*, 780 F.3d at 1009–11 (reversing a district court's denial of qualified immunity for conducting the analysis of qualified immunity's second prong at "too high a level of generality").

[129] *Thomas*, 607 F.3d at 669 (emphasis added) (citation omitted).

[130] Dkt. 53 at 85–86 (incorporating generally "all of the cases cited in Point I[I]" of her memorandum).

[131] *See United States v. Polly*, 630 F.3d 991, 997 (10th Cir. 2011) (citation omitted).

[132] *Apodaca*, 864 F.3d at 1076 (citation and quotation marks omitted).

[133] Dkt. 43-5 (Robbins Decl.) at 6 ¶ 30.

[134] Dkt. 53 at 60.

encounter that is "*materially similar*" to the facts of this case or that applies with "*obvious clarity*."[135]  Instead, she cursorily cites twelve different cases for general principles concerning the constitutionality of traffic stops and the standards governing consent.[136]  After reviewing these cases, it is clear Leyva has not cited any cases "within the relevant temporal period that even slightly resemble these facts" and "that would have provided fair warning to" a reasonable police officer that a citizen could not consent to the traffic stop in these circumstances.[137]  In other words, Leyva has failed to show how the cases she cites can be particularized to the facts in this case. Accordingly, Leyva has "not carried [her] burden of identifying cases that constitute clearly established law on these facts," and Robbins is entitled to qualified immunity.[138]

Further, it is not clear that controlling precedent can be reasonably applied and "particularized to the facts of th[is] case."[139]  Under that precedent, "[t]he critical inquiry is whether the police conduct would have communicated to a reasonable person that she was not at liberty to ignore the police presence and go about her business."[140]  And to answer that question, the Tenth Circuit looks to "all of the circumstances surrounding the incident," including several, non-exclusive factors:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention

---

[135] *Apodaca*, 864 F.3d at 1076 (citation omitted).

[136] Dkt. 53 at 85–86 (incorporating generally "all of the cases cited in Point I[I]" of her memorandum); *see also id.* at 56–67.  The cases Leyva "incorporates" are *Florida v. Bostick*, 501 U.S. 429 (1991), *Michigan v. Chestnut*, 486 U.S. 567 (1988), *Delaware v. Prouse*, 440 U.S. 648 (1979), *Terry v. Ohio*, 392 U.S. 1 (1968), *United States v. Bustillos-Munoz*, 235 F.3d 505 (10th Cir. 2000), *United States v. West*, 219 F.3d 1171 (10th Cir. 2000), *United States v. Patten*, 183 F.3d 1190 (10th Cir. 1999), *United States v. Pena*, 143 F.3d 1363 (10th Cir. 1998), *United States v. Hernandez*, 93 F.3d 1493 (10th Cir. 1996), *United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995), *United States v. Angulo-Fernandez*, 53 F.3d 1177 (10th Cir. 1995), and *State v. Gurule*, 2013 UT 58, 321 P.3d 1039.

[137] *Quinn*, 780 F.3d at 1014–15.

[138] *Id.* at 1015.

[139] *Perry*, 892 F.3d at 1123 (citation and quotation marks omitted).

[140] *Fox*, 600 F.3d at 1258 (citation, quotation marks, and brackets omitted).

of a person's personal effects; (6) a request to accompany the officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.[141]

But application of those factors does not address the issue of whether a reasonable officer in Robbins's shoes would have known that Leyva's implied consent in the text messages would not have transformed the traffic stop into a consensual encounter.

This conclusion is supported by how unique the facts of this case are from binding precedent. Prior to the traffic stop, the Tenth Circuit had decided three cases that held the cases' respective police-citizen encounters were nonconsensual.[142] None of those cases involve the facts present in this case, which include a pre-existing and ongoing relationship between the officer and the citizen, an exchange of text messages concerning the stop both before and after the stop, a time gap between the exchange of messages and the stop, and a different location for the stop than initially identified by the citizen. In short, precedent does not address nor apply to the "unique concerns" raised by this case, among which is the question: can a citizen *ever* consent to a traffic stop?[143] Indeed, this court is unaware of any case that would have put Robbins on notice that he could not pull over Leyva even if it appeared that she had consented to the traffic stop.

In sum, Robbins is entitled to qualified immunity on Leyva's Fourth Amendment claim because Leyva has failed to meet her burden under qualified immunity's second prong and the law was not clearly established at the time of the traffic stop such that a reasonable officer in Robbins's shoes would have known the traffic stop did not constitute a consensual police-citizen encounter.

---

[141] *Id.* (citation omitted).

[142] *Hatheway v. Thies*, 335 F.3d 1199 (10th Cir. 2003); *United States v. Lopez*, 443 F.3d 1280 (10th Cir. 2006); and *United States v. Fox*, 600 F.3d 1253 (10th Cir. 2010).

[143] *Quinn*, 780 F.3d at 1015.

## II. Qualified Immunity and Leyva's Fourteenth Amendment Sexual Harassment Claim

Robbins argues he is also entitled to qualified immunity on Leyva's Fourteenth Amendment sexual harassment claim and should therefore be granted summary judgment on that issue. Specifically, Robbins argues he lacked state-derived authority over Leyva, he did not sexually harass her because she welcomed his advances, and his actions were not motivated by her sex.[144] Proving sexual harassment typically involves a fact-intensive inquiry reserved for the jury, but in light of Robbins's qualified immunity defense, the court must view the undisputed facts in a light most favorable to Leyva. Doing so, the court concludes a reasonable jury could find that Robbins sexually harassed Leyva.[145] Robbins is nonetheless entitled to qualified immunity because existing law did not clearly establish that his conduct constituted sexual harassment.

### a. Framework for a Fourteenth Amendment Sexual Harassment Claim

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."[146] Sexual harassment is a form of sex discrimination prohibited by the Fourteenth Amendment.[147] In other words, the Fourteenth Amendment secures the right to be free from sexual harassment by a state

---

[144] Dkt. 43 at 23–33.

[145] Although the material facts are not in dispute, the parties contest the reasonable inferences that may be drawn from those facts. Accordingly, a reasonable jury viewing the facts in a light *most favorable to Robbins* (i.e., finding in favor of his inferences) could also conclude he *did not* sexually harass Leyva.

[146] U.S. Const. amend. XIV, § 1.

[147] *Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir. 1989) ("We hold that sexual harassment of the sort alleged by plaintiff can violate the Fourteenth Amendment right to equal protection of the laws."). Unlike other Equal Protection claims, a sexual harassment claim does not require a plaintiff to show the defendant treated the plaintiff different than similarly situated individuals or discriminated against the plaintiff because of her sex. *See id.*; *see also Eisenhour v. Weber Cty.*, 744 F.3d 1220, 1234 (10th Cir. 2014) ("concluding that . . . Ms. Eisenhour had no requirement to show she was treated differently from a similarly situated individual."; *Sh.A. ex rel. J.A. v. Tucumcari Mun. Sch.*, 321 F.3d 1285, 1289 (10th Cir. 2003) ("this standard is met by actions that amount to an abuse of governmental authority for the purpose of one's own sexual gratification.") (citation omitted). Any attempt by Robbins to argue otherwise is a misapplication and misunderstanding of the law. *See* Dkt. 43 at 29–33.

employee.[148]  This right extends to nonemployees[149] and is violated when a state actor abuses his governmental authority "for the purpose of [his] own sexual gratification."[150]  In sum, to succeed on a § 1983 claim for sexual harassment under the Fourteenth Amendment, a plaintiff must establish that: (1) the defendant had state authority over the plaintiff and (2) the defendant abused that authority for his own sexual gratification.[151]

### 1)  Robbins acted under the color of state law

Private conduct is not actionable under § 1983.[152]  Instead, only defendants "who represent the state in some capacity, whether they act in accordance with their authority or misuse it," may be liable under § 1983.[153]  To represent the state, a defendant must have acted "under color of state law."[154]  The "under color of state law" requirement is jurisdictional and requires a defendant to "have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."[155]  And "[t]he authority with which the defendant is allegedly 'clothed' may be either actual or apparent."[156]

In a sexual harassment case, a defendant generally acts under "color of state law" when his actions are "based on some authority that [he] has over the victim."[157]  "Otherwise, it is difficult

---

[148] *Sh.A.*, 321 F.3d at 1288–89.

[149] *Johnson v. Martin*, 195 F.3d 1208, 1218 (10th Cir. 1999) (citation omitted).

[150] *Sh.A.*, 321 F.3d at 1289 (citation omitted).

[151] *See id.* (noting this "standard is met by actions that amount to an abuse of governmental authority for the purpose of one's own sexual gratification.") (citation omitted); *see also Johnson*, 195 F.3d at 1218 ("to abuse any one of a number of kinds of authority for purpose of one's own sexual gratification . . . would violate the Equal Protection Clause.").

[152] *See Jojola*, 55 F.3d at 492.

[153] *Id.* (citation and brackets omitted).

[154] *See id.*

[155] *Id.* at 492–93 (citation and quotation marks omitted).

[156] *Id.* at 493 (citations omitted).

[157] *David v. City and Cty. of Denver*, 101 F.3d 1344, 1354 (10th Cir. 1996) (citation omitted).

to establish that the abusive action was perpetrated 'under color of state law' rather than as an essentially private act of sexual harassment."[158]  Accordingly, "it is the plaintiff's burden to . . . establish[] the existence of 'a real nexus' between the defendant's conduct and the defendant's 'badge' of state authority in order to demonstrate action was taken 'under color of state law.'"[159]  Generally, a plaintiff can meet this burden by showing the defendant's actions occurred while he acted "in his official capacity[,] while exercising his responsibilities pursuant to state law," or that he "abuse[d] the position given to him by the state."[160]  Further, it is clear "police officers exercise governmental authority in stopping motorists."[161]

Here, as a police officer, Robbins clearly acted "under the color of state law" when he pulled over Leyva.  Robbins had the authority to pull over motorists, like Leyva, only because he was a police officer, and he used that authority when he turned on his UHP vehicle's emergency lights to stop Leyva.  And, as discussed above, Utah law required Leyva to pull over once Robbins activated his vehicle's emergency lights.

Concerning the rest of Robbins and Leyva's interactions, it is apparent their interactions included official business with Robbins acting in his capacity as the HDTR Coordinator.  It is also apparent, however, that Robbins and Leyva's interactions included private matters unrelated to Robbins's position as the HDTR Coordinator.  But the parties' business and private interactions

---

[158] *Id.* (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992), *cert. denied*, 509 U.S. 923 (1993)).

[159] *Jojola*, 55 F.3d at 494; *see also id.* at 493 ("As we have stated, before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be a 'real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant.") (citations omitted).

[160] *Whitney v. State of New Mexico*, 113 F.3d 1170, 1174 (10th Cir. 1997) (citation omitted).

[161] *Johnson*, 195 F.3d at 1218.

are so intertwined it is impossible to separate them in a meaningful way.[162]  Thus, Leyva has met

her burden by demonstrating that Robbins exercised, at the very least, some apparent degree of

state-derived authority over her throughout their relationship.[163]

For example, Robbins admits that "at all times relevant herein,  [he] was a UHP trooper

who was acting within the course and scope of his employment, and under color of law."[164]  He

also admits that Leyva, as WCT's liaison to the UHP, was required to work with him as the HDTR

Coordinator to carry out the Towing Rotation Agreement.[165]  Under that Agreement, Robbins had

the power to suspend WCT from the HDTR for practices he determined were "unlawful,

unreasonable, or otherwise not in the best interest of the public."[166]  Among other violations

warranting suspension, Robbins could suspend WCT for failure to respond to a rotation call.[167]

And Robbins could "determine the length of any suspension."[168]

Robbins had this authority only because of his position as the HDTR Coordinator.  With

this authority, Robbins could prevent Leyva from reaching the target set by her employer[169] by

suspending WCT.  Further, because of Robbins's position, he could respond to Leyva's concerns

---

[162] For example, on May 31, 2017, Robbins relied on his authority to get Leyva's attention and to then direct an arguably flirtatious text at Leyva.  There, he texted Leyva, "Did ya hear that?"  Dkt. 43-2 at 112 (errors in original).  Leyva responded, "Nope I stepped away from my phone. Whatcha got?"  *Id.* (errors in original).  Robbins answered, "I said, Salt lake could you get a hold of west coast towing and tell their Secretary she's pretty darn sexy and doesn't need to lose any weight….. (winking emoji)[.]"  *Id.* (errors in original).

[163] *See David*, 101 F.3d at 1353–54; *see also Nieto v. Kapoor*, 268 F.3d 1208, 1216–17 (10th Cir. 2001) ("Dr. Kapoor was able to harass Plaintiffs because of his state authority as the Medical Director of a public radiation oncology department and because he supervised their work.") (citation omitted).

[164] Dkt. 20 at 3 ¶ 8, dkt. 36 at 3 ¶ 8, dkt. 40 at 6 ¶ 2, dkt. 44 at 2; *See generally Whitney*, 113 F.3d at 1175 (indicating that a relevant consideration under the "color of law" requirement is whether the victims came into contact with the defendant because of his position with the state).

[165] Dkt. 20 at 3 ¶ 10, dkt. 36 at 3–4, dkt. 40 at 6–7, dkt. 44 at 2–3.  Robbins advances no arguments attempting to distinguish the power he had over WCT from the power he had over Leyva.  *See* dkt. 43, dkt. 44, and dkt. 53.

[166] Dkt. 40-1 at 37–38.

[167] *Id.* at 32.

[168] *Id.* at 38.

[169] *See* dkt. 43 at 4 ¶¶ 3–4, dkt. 53 at 6.

about the HDTR and use these contacts as opportunities to attempt to further his desired relationship with her.[170]  Indeed, but for Robbins's position as the HDTR Coordinator, Leyva would not have had to contact him regarding the HDTR.[171]

In sum, Leyva has met her burden of showing a real nexus between Robbins' conduct and his state-derived authority as a police officer and the HDTR Coordinator.

### 2) A reasonable jury could conclude Robbins abused his authority for his own sexual gratification

Although it is "clearly established" that a government actor violates the Equal Protection Clause when he abuses his authority for his own sexual gratification,[172] the Tenth Circuit has

---

[170] *See, e.g.*, dkt. 43-2 at 112–13.

[171] *See Whitney*, 113 F.3d at 1175 ("Patrick could not have harassed Whitney absent his authority as an agent for the State.").

[172] *See Sh.A.*, 321 F.3d at 1289.  This court recognizes that this standard was first described in these terms in *Johnson v. Martin*, 195 F.3d at 1218, but a review of Tenth Circuit case law on this issue demonstrates that the terms used in *Johnson* merely clarified, instead of altered, the standard first recognized in *Starrett*.  Accordingly, this court is not limited to post-*Johnson* cases in its analysis.

addressed the conduct[173] that satisfies that standard on only five, clear[174] occasions: first in *Starrett v. Wadley*, [175] second in *Lankford v. City of Hobart*,[176] third in *Noland v. McAdoo*,[177] fourth in *Whitney v. State of New Mexico,*[178] and lastly in *Eisenhour v. Weber Cty.*[179] Accordingly, this court

---

[173] The other published cases in which the Tenth Circuit has addressed § 1983 sexual harassment claims involved legally distinct issues. *See Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726, 758–60 (10th Cir. 2014) (addressing supervisor and municipal liability); *Rost ex Rel. K.C. v. Steamboat Springs RE-2 School*, 511 F.3d 1114, 1124–25 (10th Cir. 2008) (addressing a school district's liability); *Escue v. Northern OK College*, 450 F.3d 1146, 1157– 58 (10th Cir. 2006) (holding a jury's verdict was not against the weight of the evidence under the unchallenged jury instructions); *Sh.A.*, 321 F.3d at 1289 (affirming a trial court's denial of qualified immunity under the "clearly established" prong of qualified immunity); *Maestas*, 251 F.3d at 1007–13 (addressing the special circumstances that justify a trial court sending issues under qualified immunity's second prong to a jury); *Johnson*, 195 F.3d at 1215–18 (affirming a trial court's denial of qualified immunity under the "clearly established" prong of qualified immunity); *Murrell v. School Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1249–52 (10th Cir. 1999) (addressing supervisor and school district liability); *David*, 101 F.3d at 1351–54 (deciding whether the plaintiff failed to state a claim under the "under the color of state law" requirement); *Lankford v. City of Hobart*, 73 F.3d 283, 286–88 (10th Cir. 1996) (addressing municipal liability); *Jojola*, 55 F.3d at 492– 95 (deciding whether the plaintiff failed to state a claim under the "under color of state law" requirement); *Sauers v. Salt Lake Cty.*, 1 F.3d 1122, 1129 (10th Cir. 1993) (addressing municipal liability and evidentiary issues); *Woodward*, 977 F.2d at 1400–01 (holding the law was not "clearly established" to hold the defendants who actually harassed plaintiffs liable); *D.T. by M.T. v. Independent Sch. Dist. No. 16 of Pawnee Cty., Okl.*, 894 F.2d 1176 (10th Cir. 1990) (addressing color of state law and municipal liability issues).

[174] There are other published cases where the Tenth Circuit appears to have addressed the conduct necessary to constitute sexual harassment under § 1983. *See Barney v. Pulsipher*, 143 F.3d 1299, 1312–13 (10th Cir. 1998); *Nieto*, 268 F.3d at 1217–20. It is unclear, however, whether these cases are applying the sexual harassment standard identified in *Starrett*. *See Barney*, 143 F.3d at 1312 n. 15 ("Claims of sexual harassment and assault of inmates by prison guards are more properly analyzed under the Eighth Amendment."); *Nieto*, 268 F.3d at 1217–20 (addressing the plaintiff's "hostile environment" claim under Title VII sexual harassment principles with passing reference to *Starrett*). Accordingly, this court's analysis focuses on the five cases that unambiguously address the conduct necessary to satisfy the *Starrett* standard.

[175] *See Starrett*, 876 F.2d at 814–15 (holding the evidence was sufficient to support the jury's conclusion that the defendant's conduct violated plaintiff's right to be free from sexual harassment).

[176] *See Lankford v. City of Hobart*, 27 F.3d 477, 480–81 (10th Cir. 1994) (holding that a viable § 1983 sexual harassment claim does not require the termination of the victim).

[177] *See Noland v. McAdoo*, 39 F.3d 269, 271–72 (10th Cir. 1994) (reversing a trial court's grant of summary judgment to the defendant because the plaintiff had produced sufficient evidence to create "a genuine issue of material fact concerning whether [the defendant] subjected her to sexual harassment.").

[178] *See Whitney*, 113 F.3d at 1173–75 (holding the plaintiff had made sufficient factual allegations against the defendant to state a §1983 sexual harassment claim).

[179] *See Eisenhour*, 744 F.3d at 1234–36 (reversing a trial court's grant of summary judgment to the defendant because the plaintiff had raised a genuine issue of material fact on her § 1983 sexual harassment claim.). After *Eisenhour* was remanded, a jury rendered a verdict in favor of the plaintiff on her sexual harassment claim. *Eisenhour v. Cty.*, 897 F.3d 1272, 1275 (10th Cir. 2018). The defendant appealed the jury's verdict, arguing it was not supported by sufficient evidence. *Id.* at 1275–76. But the Tenth Circuit disagreed and held that the evidence was sufficient. *Id.* Because the conduct is the same in both cases, this court only addresses the first *Eisenhour* case that was decided at the summary judgment stage of the proceedings.

turns to those cases for guidance on whether a reasonable jury could conclude Robbins sexually harassed Leyva.

First, in *Starrett v. Wadley*, the Tenth Circuit upheld a jury verdict by determining that the "sexual harassment of the sort alleged by plaintiff can violate the Fourteenth Amendment right to equal protection of the laws."[180] There, the plaintiff's supervisor "had made various sexual advances towards [the plaintiff]," repeatedly asked the plaintiff "to meet him during business hours at his house or at other secluded locations," once asked the plaintiff "to go with him to a motel," "pinched plaintiff's buttocks with his full hand," "put his arm on plaintiff's leg and invited her to his hotel room," and "often made obscene gestures to plaintiff during work hours."[181] Further, the defendant "sexually harassed other female employees in the office" and changed the way he treated the plaintiff when "she spurned his advances and complained about his harassment."[182] Ultimately, after treating the plaintiff with hostility and threatening that she would be terminated, the defendant "made good on his threats and fired plaintiff."[183]

Second, in *Lankford v. City of Hobart*, the Tenth Circuit reinstated the plaintiff's § 1983 sexual harassment claim because there was a genuine issue of material fact concerning whether the defendant's conduct constituted sexual harassment.[184] In so doing, the Circuit determined the defendant's conduct could satisfy the standard set out in *Starrett*, which "indicates that the fondling, unwelcome advances, and obscene remarks are sufficient alone to constitute sexual harassment."[185] Specifically, the *Lankford* defendant's "alleged sexual harassment included

---

[180] *Starrett*, 876 F.2d at 814–15.

[181] *Id.*

[182] *Id.* at 815.

[183] *Id.*

[184] *Lankford*, 27 F.3d at 480–81.

[185] *Id.* at 481.

fondling, requesting sexual favors, and making obscene gestures and unwelcome advances" towards the plaintiffs.[186]  When the defendant realized "his sexual advances would not be accepted," he spied on the plaintiffs and spread rumors about one of the plaintiffs.[187]  Ultimately, he "allegedly used his authority as chief of police to obtain [a plaintiff's] private medical records without her consent . . . to discredit her or to prove" the rumors he started about her sexuality.[188]

Third, in *Noland v. McAdoo*, the Tenth Circuit held that there was sufficient evidence, when "viewed in the light most favorable to plaintiff," to create "a genuine issue of material fact concerning whether [the defendant] subjected [the plaintiff] to sexual harassment."[189]  There, the evidence showed the defendant "had made numerous unwelcomed advances toward [the plaintiff]," "would stand very close to her . . . making it impossible for her to pass . . . without rubbing up against him," and "put his hand on her waist or shoulder, despite her telling him that she did not appreciate this contact."[190]  Further, the defendant "would continually ask [the plaintiff] to go to lunch with him . . . or to go on a date with him," "purchased a home two blocks from plaintiff's home 'to be closer to' her," "would buy her gifts . . . and send her flowers," and "told plaintiff that he loved her and that when he was with other women he would think about her a lot."[191]  The plaintiff complained to the defendant's superior about the defendant's conduct "on several occasions."[192]  And once the defendant became the plaintiff's supervisor, he asked her to "meet him . . . in the evening . . . to have dinner with him and to 'see if we can't get along a little

---

[186] *Id.* at 478.

[187] *Id.*

[188] *Id.*

[189] *Noland*, 39 F.3d at 272.

[190] *Id.* at 272.

[191] *Id.*

[192] *Id.*

more than we have lately.'"[193]   After the plaintiff declined the defendant's invitation, he "would not speak to plaintiff" and, "[w]ithin the few weeks," terminated her.[194]

Fourth, in *Whitney v. State of New Mexico*, the Tenth Circuit held that the plaintiff's "allegations of sexual harassment by [the defendant] [were] sufficient to state a claim for relief under § 1983."[195]   There, the plaintiff alleged the defendant "harassed her at a time that [he] had some state-derived authority over her ability to get a license" and "could not have harassed [her] absent his authority as an agent for the State."[196]   Specifically, the plaintiff attempted to get a day care license from the defendant but he "harassed her and denied her a license . . . because [the plaintiff] [was] female."[197]   After the plaintiff obtained employment with a day care facility, the defendant "continued to harass her" and made "false remarks" that "insinuat[ed] that [the plaintiff] and [her boss] were intimately involved."[198]

And fifth, in *Eisenhour v. Weber Cty.*, the Tenth Circuit again reinstated a plaintiff's § 1983 sexual harassment claim at the summary judgment stage, holding that the plaintiff had overcome the defendant's qualified immunity defense by "present[ing] evidence that would [ ] allow a reasonable jury to infer that she had been discriminated against because of her sex."[199]   There, the plaintiff alleged the defendant, a state judge and her boss, subjected her "to offensive touching and unreasonable questions about her activities away from work."[200]   Specifically, she alleged the

---

[193] *Id.*

[194] *Id.*

[195] *Whitney*, 113 F.3d at 1175.

[196] *Id.* at 1174–75.

[197] *Id.* at 1172.

[198] *Id.*

[199] *Eisenhour*, 744 F.3d at 1234–36.

[200] *Id.* at 1224.

defendant "became 'touchy' and would often stand so close to her that his groin rubbed against her," "once called [her] into his office and told her that he had a dream about her in which she was naked," and had written a romantic poem about the plaintiff.[201]   Coupled with this behavior, the defendant began requiring the plaintiff to get his approval before missing work, which included her telling him "where she was going, what she was doing, and whom she would be with."[202]   And even though the plaintiff reported the defendant's sexual harassment, the Circuit noted that "[o]ur cases do not suggest that a plaintiff's failure to report harassment precludes liability for an equal-protection violation."[203]

These cases demonstrate that a defendant abuses authority when he utilizes his state-derived authority as part of or to perpetuate the harassment.[204]   Evidence of a defendant relying in any way on his state-derived authority to attempt to influence or coerce a plaintiff to succumb to sexual advances satisfies this requirement.[205]   Thus, threats or promises backed by state authority would be clear abuses.[206]   Likewise, actual adverse action punishing a plaintiff's rebuffs or actual benefits given for a plaintiff's coerced consent constitutes clear abuses.[207]

Additionally, these cases show that a defendant abuses his authority for his own sexual gratification when he engages in persistent, sexual advances towards the plaintiff.[208]   Sexual

---

[201] *Id.*

[202] *Id.*

[203] *Id.* at 1235 (citations omitted).

[204] *See id.* at 1175 ("Patrick could not have harassed Whitney absent his authority as an agent of the State.") (citation omitted).

[205] *See id.* at 1174 ("[T]he jury reasonably could have concluded that [Xiong] used his government position to exert influence and physical control over these plaintiffs in order to sexually assault them.") (quoting *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 480 (9th Cir. 1991)).

[206] *See Starrett*, 876 F.2d at 815 ("Wadley ultimately made good on his threats and fired plaintiff.").

[207] *See id.*

[208] *See id.* at 812; *see also Noland*, 39 F.3d at 272.

advances may include egregious conduct like obscene gestures, obscene comments, or sexual touching.[209]  They may also include repeated and persistent requests for dates, expressions of romantic feelings, or giving of gifts.[210]  And although there is a stronger showing of sexual harassment when a defendant continues his sexual advances despite the plaintiff having made it clear the conduct is unwelcome or unwanted, this is not a requirement.[211]

Considering these principles, this case presents a very close call.  But a reasonable jury viewing the facts in a light most favorable to Leyva could conclude that Robbins abused his authority for his own sexual gratification.  Early in the parties' interactions, Robbins used his position as a police officer to pull over Leyva just to see her.[212]  Further, Robbins utilized his position as the HDTR Coordinator—and his work phone—throughout the parties' interactions to maintain contact with Leyva, direct sexual comments at her, ask her for her "sexiest picture," invite her out to drinks, invite himself over to her house, and call her names like "my lady" and "babe." He also deleted his text messages with Leyva so his wife would not find them.[213]  When the parties' spoke on the phone in June 2017, a reasonable jury could find that Robbins threatened Leyva with adverse action in the HDTR when he told her not to give him a reason not to like her.[214]

---

[209] *See Starrett*, 876 F.2d at 812; *see also Lankford*, 27 F.3d at 481 ("fondling, unwelcome advances, and obscene remarks are sufficient alone to constitute sexual harassment.") (citation omitted).

[210] *See Starrett*, 876 F.3d at 812; *see also Noland*, 39 F.3d at 272; *Eisenhour*, 744 F.3d at 1224.

[211] *See generally Whitney*, 113 F.3d at 1174–75 (explaining that Whitney's allegations, which did not include any assertion that she had informed the defendant or his supervisors that his actions were unwanted, were sufficient to state a § 1983 sexual harassment claim); *see also Eisenhour*, 744 F.3d at 1235 ("Our cases do not suggest that a plaintiff's failure to report harassment precludes liability for an equal-protection violation.") (citations omitted).

[212] Dkt. 43-3 (Leyva Depo.) at 54:20–21 ("I don't need to see that, just seeing you is enough.").

[213] Dkt. 43-7 (Robbins Depo.) at 25:5–17.

[214] Dkt. 40 at 9 ¶ 20 ("Now, *do not* give me a reason not to like you.").

Additionally, even though some of Leyva's text messages can be reasonably interpreted as flirtatious, she "strictly disclaims any intentionally flirtatious behavior toward Robbins"[215] and asserts that she "politely attempted to deflect Robbins' unwanted suggestive text messages, but she also had to avoid upsetting Robbins since he controlled [WCT's] access to lucrative heavy duty towing jobs."[216] Thus, according to Leyva, some of her text messages "reflected an attempt to humor Robbins so as not [to] make him angry."[217] A reasonably jury could interpret the record consistent with Leyva's view.

For example, Robbins repeatedly professed his sexual attraction to Leyva, but the record does not show that she returned the favor.[218] He also invited himself to Leyva's home four times, but she never appears to have accepted those invitations.[219] Further, he asked her to send him her "sexiest picture," and she denied the request.[220] He regularly commented on Leyva's physical appearance and called her names like "sweet pea," "skinny lady," "my lady," "hot blond chick," and "babe," but Leyva did not reciprocate.[221] When the parties got together for meals, it was to address business.[222] And in early May 2017, Leyva told her boss that Robbins was sexually harassing her,[223] and the UHP was contacted.[224] The UHP's internal investigation also drew three relevant conclusions: (1) when Robbins took Leyva on the ride-along, his "intentions were

---

[215] Dkt. 40 at 8 ¶ 15.

[216] *Id.*

[217] *Id.*

[218] Dkt. 43-2 at 34, 51, 109–10, 112–13.

[219] *Id.* at 29, 90, 104, 145.

[220] *Id.* at 29–30.

[221] *Id.* at 18, 25, 38, 50, 69, 79, 82, 86, 111, 128.

[222] Dkt. 53 at 17, dkt. 43-3 (Leyva Depo.) at 111:23–112:24, dkt. 64 at 5–6.

[223] Dkt. 40 at 9 ¶ 21, dkt. 40-1 at 6 ¶ 20, dkt. 44 at 7.

[224] Dkt. 40 at 9–10, dkt. 44 at 7–8.

personal to further [his] desired relationship with [her] rather than work related"; (2) Robbins pulled Leyva over "without probable cause just to see [her] and further advance [his] desired relationship"; and (3) Robbins violated multiple UHP policies when he used his government-issued phone to send Leyva "unprofessional communications."[225]

In sum, viewing these undisputed facts in the light most favorable to Leyva, a reasonable jury could conclude Robbins sexually harassed her.

### b. The law on sexual harassment claims was not clearly established

Robbins argues the law on sexual harassment claims was not clearly established.[226] In particular, Robbins argues Leyva cannot cite a case that clearly governs his conduct.[227] The court agrees. Leyva has not identified binding precedent that involves "*materially similar* conduct" or that "applies with *obvious clarity*"[228] in a manner that would have made it "apparent to a reasonable officer" that Robbins's conduct violated Leyva's constitutional right to be free from sexual harassment.[229] Accordingly, Leyva has not met her burden,[230] and Robbins is entitled to qualified immunity.

Leyva attempts to meet her burden by citing to *Johnson* and arguing that it clearly established Robbins's conduct violates the Fourteenth Amendment.[231] But *Johnson* did not address the *conduct* that constitutes sexual harassment.[232] Rather, *Johnson* clearly established that

---

[225] Dkt. 55-1 at 1–3 (SEALED).

[226] Dkt. 43 at 37–39.

[227] *Id.* at 38.

[228] *Apodaca*, 864 F.3d at 1076 (citation and quotation marks omitted).

[229] *Thomas*, 607 F.3d at 669 (citations omitted).

[230] *See id.*

[231] Dkt. 53 at 86–87.

[232] *See Johnson*, 195 F.3d at 1215–18.

anyone who abuses his state-derived authority for the purpose of his own sexual gratification violates the Equal Protection Clause regardless of the setting where that abuse occurs, e.g., an employer-employee setting,[233] teacher-student setting,[234] or a state actor-private citizen setting.[235] Thus, Leyva's reliance on *Johnson* is misplaced.

But even assuming the Tenth Circuit had addressed and held that the *Johnson* defendant's conduct constituted sexual harassment, the facts of that case are not "particularized to the facts of th[is] case."[236]  In *Johnson*, the defendant who sexually harassed the plaintiffs held a state job with the "authority to certify that various construction projects complied with municipal building codes."[237]  In claiming the defendant sexually harassed them, "the plaintiffs' allegations differ[ed] in many details, [but] most involve[d] attempts by [the defendant] to obtain sexual favors in exchange for favorable consideration of permit applications and favorable determinations of compliance with city codes."[238]  Those allegations included the defendant making sexual comments, engaging in unwelcome sexual touching, looking under one plaintiff's nightgown, soliciting plaintiffs for sex in exchange for favorable treatment, attempting "forcible sex," threats to find a plaintiff's business in violation coupled with sexual remarks, offering money in exchange

---

[233] *See id.* at 1217.

[234] *See Sh.A.*, 321 F.3d at 1289 ("In light of *Johnson* and *Franklin*, we conclude that a reasonable teacher would have known in the spring of 1997 that sexual harassment which gives rise to a violation of equal protection in the employment context will also do so in the teacher-on-student context.").

[235] *See Johnson*, 195 F.3d at 1218.

[236] *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation and quotation marks omitted).  Indeed, even if Leyva had attempted to analogize the facts here to the facts in *Starrett*, *Lankford*, *Noland*, *Whitney*, or *Eisenhour*, Robbins's conduct in the context of this case is easily distinguished from the obviously violative conduct in those cases, which is outlined in detail *supra* at 29–32.

[237] *Johnson*, 195 F.3d at 1211.

[238] *Id.*

for sex, "hugging and touching [a plaintiff] in a sexual manner," and making comments about one plaintiff's appearance.[239]

Robbins's conduct is not "*materially similar*" to the *Johnson* defendant's conduct, and no reasonable officer would understand that *Johnson* applies "with *obvious clarity*" to Robbins's conduct.[240] Specifically, Robbins never sexually assaulted Leyva nor attempted to obtain sexual favors in exchange for doing his job. There is no evidence Robbins ever sabotaged or manipulated the HDTR to further his relationship with Leyva or otherwise.[241] And apart from some "hugging" Leyva attempts to characterize as similar to the *Johnson* defendant's "hugging and touching in a sexual manner," there is no evidence Robbins ever sexually touched Leyva.[242]

Additionally, although Robbins sent texts with sexual innuendo and concerning Leyva's appearance, Leyva also used sexual innuendo during text conversations and openly discussed her weight with Robbins as part of their weight loss competition.[243] She also texted Robbins messages that can reasonably be interpreted as flirtatious.[244] Further, Leyva initiated many text conversations that were unrelated to business, invited Robbins to get together for meals, and attended business meals with Robbins that were organized through text messages with what can reasonably be viewed as sexual overtures.[245] Also, the record does not indicate Robbins persisted in his conduct despite learning of Leyva's complaint to her boss in May 2017 because it appears Robbins did not learn of Leyva's complaint until the internal investigation began in June 2017.

---

[239] *Id.* at 1211–12.

[240] *Apodaca*, 864 F.3d at 1076 (citations omitted).

[241] *See* dkt. 43-3 (Leyva Depo.) at 85:4–8; dkt. 43-5 (Robbins Decl.) at 3–4, 8; dkt. 43-7 (Robbins Depo.) at 8–83.

[242] Dkt. 53 at 69–70.

[243] *See* Dkt. 43-2 at 36–37, 124–25.

[244] *See id.* at 30 (Well . . . how can we remedy that??").

[245] Dkt. 43-2 at 36–37, 50, 56–57, 61, 79–80, 91, 101–02, 121, 126, 133.

Conversely, Leyva's arguably flirtatious conduct appears to have continued even after she lodged her complaint against Robbins. At bottom, Robbins's conduct in the context of the parties' relationship—at least as revealed by text messages—is clearly distinct from the *Johnson* defendant's egregious misconduct and is not the type of "obviously egregious" conduct that justifies "less specificity from prior case law to clearly establish the violation."[246]

Accordingly, Robbins is entitled to qualified immunity on Leyva's Fourteenth Amendment claim because Leyva has not carried her burden by citing to precedent that clearly establishes the unconstitutional nature of Robbins's conduct. Indeed, the court is unaware of any pre-existing authority that clearly establishes the violative nature of Robbins's conduct.

## CONCLUSION

Applying the qualified immunity standard, the court concludes a reasonable jury could find Robbins violated Leyva's Fourth and Fourteenth Amendment rights. Nonetheless, Robbins is immune under the second prong of the qualified immunity defense on each claim. For the foregoing reasons, Robbins's Motion for Summary Judgment is GRANTED,[247] Leyva's Motion for Summary Judgment is DENIED,[248] and the Clerk of Court is directed to close the case.

SO ORDERED this 3rd day of April 2020.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[246] *A.M.*, 830 F.3d at 1135–36 (citations omitted).

[247] Dkt. 43.

[248] Dkt. 40.